

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-8-2001

# Welker v. Clarke

Precedential or Non-Precedential:

Docket 00-1161

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Welker v. Clarke" (2001). *2001 Decisions*. Paper 23.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/23

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 8, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1161

JULIE WELKER; WELKER `99;
EVA K. COHEN; SYLVESTER GRIFFIN;
ALAN BURGESS

v.

DARRELL L. CLARKE; JOHN DOES; JANE DOES, 1-20;
PHILADELPHIA COUNTY BOARD OF ELECTIONS;
JOHN ROES; JANE ROES, 1 - 20

Julie Welker; Welker `99,

        Appellants

*Amended per Clerk's Order filed 9/5/00

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 99-cv-03552)
District Judge: Hon. Ronald L. Buckwalter

Argued December 5, 2000

BEFORE: BARRY, COWEN and WOOD,**
Circuit Judges

(Filed: February 8, 2001)

_____
** Honorable Harlington Wood, Jr., United States Circuit Judge, U.S.
Court of Appeals for the Seventh Circuit, sitting by designation.

Bruce S. Marks, Esq. (Argued)
Egorov, Puginsky, Afanasiev &
 Marks
1835 Market Street, 28th Floor
Philadelphia, PA 19103

 Counsel for Appellants

Nelson A. Diaz, Esq.
Blank, Rome, Comisky & McCauley
One Logan Square
Philadelphia, PA 19103

 Counsel for Appellee
Philadelphia Housing Authority

Gregory M. Harvey, Esq. (Argued)
Montgomery, McCracken, Walker &
 Rhoads
123 South Broad Street
Philadelphia, PA 19109

 Counsel for Appellee
Darrell L. Clarke

John S. Summers, Esq.
John P. Lavelle, Jr., Esq. (Ar gued)
Hangley, Aronchick, Segal & Pudlin
One Logan Square, 27th Floor
Philadelphia, PA 19103

Howard Lebofsky, Esq.
City of Philadelphia Law Department
1515 Arch Street
One Parkway
Philadelphia, PA 19102

 Counsel for Appellee
Philadelphia County Board of
Elections

OPINION OF THE COURT

COWEN, Circuit Judge.

I.

On May 18, 1999, appellant Julie Welker ran against appellee Darrell Clarke in the Democratic primary for the Fifth Council District seat on the Philadelphia City Council. According to the official election results, Welker received 140 fewer votes than Clarke. Immediately following the election, Welker began an investigation of the area where Clarke had received the majority of his votes. 1 Welker maintains this investigation revealed a patter n of fraud and illegality, including votes cast by persons who did not meet Pennsylvania's residency requirements. More specifically, Welker alleged that, contrary to state law, officials of the County Board of Elections permitted persons who had moved to vote in the election districts wher e they had formerly resided. During discovery W elker produced lists of approximately 300 persons who cast votes, but whose listed addresses were for abandoned homes and empty lots.2 She

_____

1. Welker and several supporters initiallyfiled an election contest in the Court of Common Pleas for Philadelphia County claiming that numerous signatures in the poll books (indicating who had voted) were forged. The state court provided an accelerated schedule of discovery and Welker eventually identified over one thousand supposedly suspect signatures. On the date both sides were to provide the reports of their handwriting experts Welker moved to withdraw her petition without prejudice, a motion that was subsequently granted. In this federal action Welker has not pointed to a single allegedly forged signature.
2. The Board of Elections presented evidence to the District Court that at least 54 of the challenged voters did, in fact, r eside in their voting districts. For example, some of the voters' addr esses were misprinted in the registration records and others had resided at their registered addresses at the time of the primary, but had since moved. The Board also presented evidence that three of the challenged voters had not voted in the election. There were no findings of fact made by the District Court regarding these competing claims and we ar e thus unable to determine how many votes might have been cast by voters who did not then live in the voting districts in which they were r egistered.

also identified persons who voted, but who had moved from the residence listed in the voter registration rolls many years prior. In two instances, those persons no longer resided in the city or county in which they voted. She argues that the intentional or reckless failure of the County Board and Division officials to comply with state residency requirements destroyed the integrity of the voter registration rolls and amounted to stuffing the ballot box in violation of the Civil Rights Act, 42 U.S.C. S 1983, the Voting Rights Act, 42 U.S.C. S 1971, and the Fourteenth Amendment. The validity of these causes of action is based on the specific allegation in Welker's complaint that election officials conspired with the Clark campaign to violate election laws in order to dilute the votes of W elker's supporters. In the absence of such an allegation, it is not clear that claims made by Welker would support intervention by a federal court in this election. 3

_____

3. This was a purely municipal election, with no federal candidates on the ballot. There are no contentions that election officials treated the supporters of the two candidates differ ently. Further, Welker has not argued that the supposed violations of the election laws could not have been remedied in a state court action. If W elker's claims were only that officials negligently maladministered the election by not properly enforcing the Pennsylvania residency r equirements as interpreted by Welker, we would hesitate to intervene. Under similar circumstances, other circuits have determined that such disputes do not state a constitutional violation and therefore do not rise to the level appropriate to support federal court interference in a local election. See Gold v. Feinberg, 101 F.3d 796, 800 (2d Cir. 1996) (refusing to interfere in a state election where one-third of voting machines arrived late, some ballots were defective, and an ineligible candidate was on the ballot); Curry v. Baker, 802 F.2d 1302, 1314-15 (11th Cir. 1986) (Court found no equal protection violation in the absence of evidence that maladministration of local election was the r esult of an intent to discriminate against voters or to subvert their right to choose their representative); Hennings v. Grafton , 523 F.2d 861, 864 (7th Cir. 1975) (finding no constitutional violation where irregularities were caused by mechanical or human error and were not due to invidious or fraudulent intent); Pettengill v. Putnam County R-1 School District, 472 F.2d 121, 122 (8th Cir. 1973) (no constitutional basis for intervening in a local election absent aggravating factors such as evidence of race discrimination, fraudulent interference with election results, or other unlawful conduct interfering with an individual's right to vote).

4

During the course of the proceedings in the court below, Welker moved for a preliminary injunction and declaratory judgment that voters could not vote in state and municipal elections if they were registered as residing at addresses from which they had moved pursuant to 25 P .S. S 961.901(B)(2). The district court denied these motions concluding that Pennsylvania law did not preclude such persons from voting. As a result of this ruling Welker concluded that she could not meet her burden of showing sufficient illegal votes to overturn the election. Therefore, she moved for an adverse order dismissing the case in order to appeal this determinative ruling. Appellees, Clarke and the Philadelphia County Board of Elections, cross-moved for summary judgment. The district court granted the motion for summary judgment and Welker now appeals that order. Because we agree with the district court that Pennsylvania law does not preclude persons who are registered at addresses from which they have moved from voting, we will affirm the district court's grant of summary judgment in favor of the appellees.

II.

Welker's underlying claim alleges that the failure of election officials to enforce Pennsylvania's voter eligibility requirements amounted to ballot-stuffing and voter dilution in violation of the Civil Rights Act, 42 U.S.C.S 1983, the Voting Rights Act, 42 U.S.C. S 1971, and the Fourteenth Amendment. We exercise subject matter jurisdiction pursuant to 28 U.S.C. S 1331 and 28 U.S.C.S 1343.

Welker's attempt to prove that illegal votes were cast in the May 18, 1999, Philadelphia City Council election turns on the interpretation of S 901(B)(2) andS 501(A) of the Pennsylvania Voter Registration Act (PVRA). Section 901(B)(2) provides:

> An elector who removes residence fr om one place to another within the same county and who has not yet filed a removal notice with the commission shall be permitted to vote at the election next following removal if, at the time of signing [the] voters certificate, the elector files with the judge of elections a signed removal notice properly filled out.

5

Section 501(A) provides in relevant part,"[i]f an individual is qualified to vote in an election district prior to removal of residence, the individual may, if a resident of this Commonwealth, vote in the election district fr om which residence was removed within the 30 days preceding the election." Welker urges that the pr oper construction of these two sections of the PVRA is that, if a person has moved more than 30 days prior to a state or municipal election, that person may not legally vote in the election district where s/he formerly resided unless (a) the new residence is in the same county; (b) the election in which the voter seeks to vote is the first election since the move; and (c) the voter files a "removal notice" with the judge of election upon showing up to vote. The purported rationale of this provision is to serve the compelling state interest of preventing fraud and dilution of the votes of persons actually residing in the election district. Under this interpretation, each of the 300 voters identified by Welker were ineligible to vote.

At first glance this interpretation has some appeal. However, a closer inspection reveals that Welker's urged construction conflicts with other, contr olling provisions of the PVRA and runs contrary to the Pennsylvania legislature's intent to create a single, unified electorate for both state and federal elections. Pennsylvania adopted the PVRA in 1995, in response to the passage of the National Voter Registration Act (NVRA) in 1993. One of the NVRA's central purposes was to dramatically expand opportunities for voter registration and to ensure that, once registered, voters could not be removed from the r egistration rolls by a failure to vote or because they had changed addresses. 42 U.S.C.A. S 1973gg(b). To achieve this purpose, the NVRA strictly limited removal of voters based on change of address and instead required that, for federal elections, states maintain accurate registration r olls by using reliable information from government agencies such as the Postal Service's change of address records. 42 U.S.C.A. S 1973gg-6(b)(1). The NVRA went even further by also r equiring the implementation of "fail-safe" voting pr ocedures to ensure voters would not be removed from r egistration rolls due to clerical errors or the voter's own failur e to re-register at a new address. 42 U.S.C.A. S 1973gg-6(b)(1); See also H.R.

6

Rep. No. 103-9, at 18 (1993), reprinted in 1993 U.S.C.C.A.N. 105. Of course, these procedur es were mandated only with respect to federal elections. 42 U.S.C.A. S 1973gg(b). States remained free to maintain a different voter registration system for state and local elections, even though doing so would create two differ ent electorates.

Because it quickly became apparent that maintaining two sets of registration rolls would impose massive administrative and economic burdens, most states elected to adopt the NVRA registration procedur es for their state and local elections as well as federal elections, thereby producing a single, unified registration system and electorate. Pennsylvania is no exception. In early 1995, Pennsylvania was sued in federal court for its failure to comply with the NVRA. See Association of Community Organizations for Reform Now (ACORN) v. Ridge, et al., Civ. A. No. 95-382 (E.D. Pa.). The court entered an Order holding that several aspects of Pennsylvania election law conflicted with and were therefor e pre-empted by the NVRA with respect to federal elections. ACORN v. Ridge, 1995 WL 136913 (E.D. Pa. Mar. 30, 1995). The ACORN court specifically referenced the parts of Pennsylvania law that required the filing of removal notices for continued eligibility to vote as contravening the fail-safe pr ovisions of the NVRA. ACORN v. Ridge, Order (E.D. Pa. May 4, 1995).

In response to the enactment of the NVRA and the ACORN decision, Pennsylvania enacted significant changes to its voting laws. When enacting the new election law, the PVRA, the legislature had two goals in mind – to adopt a single, unified registration system, fully compliant with the NVRA for both federal and local elections, while also maintaining as much of Pennsylvania's pre-NVRA registration system as possible. The pr ovisions upon which Welker relies are provisions that were carried over from Pennsylvania's pre-NVRA registration system. 25 P.S. SS 961.501, 961.901. Compare 25 P.S. SS 623-21 (repealed), 623-28 (repealed), 951-19 (repealed), 951-26 (repealed). Recognizing that many of the carry-over provisions were potentially inconsistent with the NVRA, the legislature also adopted a parallel set of procedures intended to comply the NVRA. Those procedures, set out in Chapter 19 of the

7

PVRA, were adopted to permit Chapter 19 to supersede the carry-over provisions if the Secretary of the Commonwealth determined that the carry-over provisions were inconsistent with the mandates of the NVRA. 25 P.S. S 961.5103. Within weeks of the passage of the PVRA, the Secretary suspended SS 906-912 in deference to Chapter 19. Pennsylvania Bulletin Vol. 25, No. 28 (July 15, 1995).

Chapter 19 of the PVRA establishes procedur es virtually identical to those of the NVRA for the removal of voters from Pennsylvania registration rolls for state and local elections. Section 1901 strictly limits the manner and circumstances under which a voter's registration may be canceled. 25 P.S. S 961.1901. Section 1901(a) provides:

> An elector's registration shall not be canceled except as follows:
>
> (1) At the request of the elector.
>
> (2) Upon the death of the elector under section 905.
>
> (3) Upon confirmation that the elector has moved to a residence outside the county.
>
> (4) Under a voter removal program as pr ovided for under subsection (b).

Subsection (b) specifies the required and permissible voter removal programs, which requir e the updating of registration records based on either information supplied by the Postal Service or obtained by a commission through countywide confirmation mailings and per mitting the use of district-wide canvasses and confirmation notices mailed to voters who have not voted within five years. 25 P .S. S 961.1901(b). Further, S 1901(d) narrowly restricts the ability of a commission to cancel the registration of a voter if there is any possibility the voter has changed residence. Under the terms of Chapter 19, none of the 300 voters challenged by Welker voted illegally.

There is a clear conflict between appellants' interpretation of SS 961.501 and 961.901 and Chapter 19. The Pennsylvania legislature and the Secr etary of the Commonwealth have made it exceedingly clear that when such conflicts arise, the provisions of Chapter 19 must

8

control. To hold otherwise would be to cr eate a system whereby some voters are eligible to vote only in state and local elections, but other voters are eligible to vote in all elections. This is exactly the kind of dual r egistration system the Pennsylvania legislature sought to avoid by enacting the PVRA.

Appellants argue that such an interpretation is contrary to established rules of statutory construction that hold that "when construing a statute, it is the function of the court to give effect to all of its provisions." In re Canvassing of Certain Voting Machines, 475 A.2d at 1325, 1327 (1984). This argument ignores the clear dir ection of the Pennsylvania Supreme Court that:

> The language of a statute must be read in a sense which harmonizes with the subject matter and its general purpose and object. The general design and purpose of the law is to be kept in view and the statute given a fair and reasonable construction with a view to effecting its purpose and object, even if it be necessary, in doing so, to restrict somewhat the for ce of subsidiary provisions that otherwise would conflict with the paramount intent.

Swartley v. Harris, 40 A.2d 409, 411 (Pa. 1944). The overriding purpose of the Legislature in enacting the PVRA was to comply with the NVRA in such a way as to cr eate a single unified system of voter registration in the state. If S 901(B)(2) were interpreted in the manner proposed by Welker, that paramount intent would clearly be defeated. Thus, the District Court properly deter mined that Welker's interpretation of the statute could not be given effect. In affirming the District Court, we are not holding that S 901(B)(2) is completely null and void. Rather, we are merely holding that this provision cannot have the meaning urged by Welker. We will leave it to the state courts of Pennsylvania, deciding future election contr oversies, to determine what, if any, permissible meaning might be given to S 901(B)(2).4

_____

4. For example, in the present case the District Court noted that S 901(B)(2) can be interpreted as simply outlining one of several ways to

Finally, appellants argue that there is no conflict because they are not suggesting that the contested voters should be removed from the registration r olls. Instead, they argue these voters are simply ineligible to vote. W e decline to adopt this semantic distinction. If voters ar e declared "ineligible" even though they are r egistered to vote, the effect is the same -- they are excluded from voting in state and local elections, while remaining "eligible" to vote in federal elections thereby contravening the expr ess purpose of the PVRA to create a unified electorate. If state election officials were required to implement S 901(B)(2) in the manner suggested by Welker, it would be necessary for the voter registration lists to indicate whether voters were eligible to vote in all elections or only in federal elections. This would impose the precise burden that the Pennsylvania Legislature sought to avoid when it enacted the PVRA.

Appellants' interpretation of SS 501(A) and 901(B)(2) creates a direct conflict with Chapter 19 of the PVRA. The legislature was clear that when carry-over pr ovisions like 901(B)(2) and 501(A) conflict with Chapter 19, Chapter 19 is controlling. In light of our construction of the statute, Welker herself acknowledges that she cannot meet the burden of proving the existence of "illegal" votes, a necessary element of her federal claims.

III.

For the foregoing reason, the District Court's judgment of January 31, 2000 will be affirmed.

_____

register to vote, thus completely avoiding a conflict between it and Chapter 19. Welker v. Clarke, Memorandum (E.D. Pa. Oct. 26, 1999). There may be other possible interpretations that could be applied consistent with the overall purpose of the PVRA. The meaning of S 901(B)(2) is not relevant to the dispute before us, however, and it is not our intent to fix that meaning in this opinion.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

11