[No. C040466. Third Dist. Jan. 15, 2004.]

PEACE AND FREEDOM PARTY et al., Plaintiffs and Appellants, v.
KEVIN SHELLEY, as Secretary of State, etc., Defendant and Respondent.

**COUNSEL**

Robert J. Evans for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Louis R. Mauro, Assistant Attorney General, Kenneth R. Williams and Jill Bowers, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**SCOTLAND, P. J.**—The Peace and Freedom Party (PFP) sought, by a petition for writ of mandate, to compel the Secretary of State to include voters listed in the inactive file of registered voters in calculating whether PFP qualified to participate in the March 2002 primary election pursuant to Elections Code section 5100, subdivision (b). (Further section references are to the Elections Code unless otherwise specified.) Finding the Legislature has explicitly excluded such voters from the calculation (§ 2226, subd. (a)(2)), the superior court rejected PFP's claims that so interpreting the statutory scheme violates federal constitutional and statutory law.

PFP appeals from the judgment denying its writ petition. Although the March 2002 primary election is long passed, the issue PFP raises is likely to recur in future elections and is a matter of continuing public interest and importance. Thus, we exercise our discretion to decide the issue on the merits, even though it is technically moot. (*Burch v. George* (1994) 7 Cal.4th 246, 253, fn. 4 [27 Cal.Rptr.2d 165, 866 P.2d 92]; *Lundquist v. Reusser*

(1994) 7 Cal.4th 1193, 1202, fn. 8 [31 Cal.Rptr.2d 776, 875 P.2d 1279]; *Libertarian Party v. Eu* (1980) 28 Cal.3d 535, 539–540 [170 Cal.Rptr. 25, 620 P.2d 612].)

We shall affirm the judgment. As we will explain, the Legislature's decision to exclude voters on the inactive file of registered voters from the calculation to determine whether a political party qualifies to participate in a primary election pursuant to section 5100, subdivision (b), passes constitutional muster. Because information in the inactive file is unreliable and often duplicative of information in the file of active voters, the exclusion is a reasonable, nondiscriminatory restriction that furthers the state's compelling interest in protecting the integrity and stability of the electoral process in California. For the same reason, the exclusion is consistent with the intent and provisions of the National Voter Registration Act (42 U.S.C. § 1973gg et seq.).

## BACKGROUND

PFP sought to qualify to participate in the March 2002 primary election pursuant to section 5100, which states in pertinent part: "A party is qualified to participate in any primary election . . . [¶] . . . [¶] (b) If on or before the 135th day before any primary election, it appears to the Secretary of State, as a result of examining and totaling the statement of voters and their political affiliations transmitted to him or her by the county elections officials, that voters equal in number to at least 1 percent of the entire vote of the state at the last preceding gubernatorial election have declared their intention to affiliate with that party."

The requisite number of voters equivalent to one percent of the entire vote at the then last preceding gubernatorial election was 86,212 voters. According to PFP, the Secretary of State reported that 70,832 registered voters were affiliated with PFP and, hence, PFP did not qualify to participate in the March 2002 primary election. In determining whether PFP had met the criteria set forth in section 5100, subdivision (b), the Secretary of State did not include voters whose names had been placed on the inactive file of registered voters. PFP's petition for writ of mandate claimed that if voters listed on the inactive file were included in the calculation, then PFP and its candidates would qualify to participate in the primary election.

The Secretary of State's decision to exclude voters listed on the inactive file in the calculation apparently was premised on section 2226, subdivision (a), which states: "Based on change-of-address information received pursuant to Sections 2220 to 2225, inclusive, or change-of-address information provided directly by the voter, the county elections official shall take the

following actions as appropriate: [¶] (1) If the information indicates the voter has moved to a new address within the same county, the county elections official shall update and correct the voter's registration. [¶] (2) If the information indicates the voter has moved to a new address in another county, if the mailings have been returned as undeliverable, or if the voter fails to confirm his or her address as required by Section 2224, *the county elections official may place the voter's name on the inactive file of registered voters who* do not receive election materials and *are not included in calculations to determine the number of signatures required for qualification of candidates and measures, precinct size, or other election administration related processes.*" (Italics added.)

PFP asserted that the calculation whether a political party qualifies for participation in a primary election pursuant to section 5100, subdivision (b), is *not* one of the "other election administration related processes" referred to in section 2226, subdivision (a)(2); therefore, it is not a calculation from which voters listed on the inactive file are excluded. Pointing out that such voters remain registered voters until their affidavits of registration are cancelled by the county elections official (§ 2200), PFP argued they are voters within the meaning of section 5100, subdivision (b), for the purpose of calculating whether the political parties with which they had affiliated would qualify for participation in the primary election. In PFP's view, a contrary interpretation would violate the National Voter Registration Act (42 U.S.C. § 1973gg et seq.)

The Secretary of State opposed PFP's petition for writ of mandate, asserting that the inactive file of registered voters is not a reliable source of voter registration information because it contains errors and is potentially duplicative of names on the active voters list. According to the declarations of various election officials, there are many reasons a voter's registration may be moved to the inactive file, including death, moving to a different county, a name change, notification by the post office that mail is undeliverable to the voter's address, the receipt of a National Change of Address notice, registration with a different political party, and the failure to vote in two consecutive federal elections and to respond to attempts by the county to contact the voter. Generally, if election officials receive direct information from a voter that he or she has moved or otherwise changed his or her registration, the voter's old registration information is updated and not placed in the inactive file. But if the official receives the information indirectly, such as through information from the postal service, then the voter's registration is placed in the inactive file.

John Mott-Smith, Chief of the Elections Division, declared: "The file of active voters represents persons who are properly registered at their current

address, are not deceased, and whose registration is not duplicative of another registration on the voter file. The file of active voters is used as the basis for the report of registration, for calculating the number of voters per precinct as provided by statute, for printing and mailing sample ballots and other election materials, as well as other election administration purposes. The file of inactive voters, on the other hand, consists of records of voters where the election official has received notice that the voter has moved, [is] deceased, or is no longer eligible to vote. The inactive file exists for the single purpose of ensuring that a mistake was not made when the voter was moved from the active file, and is, in effect, a holding file until a voter's registration may be permanently cancelled."

Mott-Smith further declared that, pursuant to a stipulation with the United States Department of Justice, voters placed on the inactive file of registered voters as the result of the alternate residency confirmation process authorized by section 2224 may never be moved off the inactive list to the list of cancelled voters.[1]

Consequently, Mott-Smith declared that the inactive file of registered voters contains duplicate names and erroneous information, and that there "is

---

[1] Section 2224 states: "(a) If a voter has not voted in any election within the preceding four years, and his or her residence address, name, or party affiliation had not been updated during that time, the county elections official may send an alternate residency confirmation postcard. The use of this postcard may be sent subsequent to [the National Change of Address System] or sample ballot returns, but shall not be used in the residency confirmation process conducted under Section 2220. The postcard shall be forwardable, including a postage-paid and preaddressed return form to enable the voter to verify or correct the address information, and shall be in substantially the following form: [¶] 'If the person named on the postcard is not at this address, PLEASE help keep the voter rolls current and save taxpayer dollars by returning this postcard to your mail carrier.' [¶] 'IMPORTANT NOTICE' [¶] 'According to our records you have not voted in any election during the past four years, which may indicate that you no longer reside in _____ County. If you continue to reside in this county you must confirm your residency address in order to remain on the active voter list and receive election materials in the mail.' [¶] 'If confirmation has not been received within 15 days, you may be required to provide proof of your residence address in order to vote at future elections and, if you do not appear or offer to vote at any election in the period between the date of this notice and the second federal general election after the date of this notice, your voter registration will be cancelled and you will have to reregister in order to vote. If you no longer live in _____ County, you must reregister at your new residence address in order to vote in the next election. California residents may obtain a mail registration form by calling the county elections office of the Secretary of State's Office.' [¶] (b) The use of a toll-free number to confirm the old residence address is optional. Any change to a voter's address shall be received in writing. [¶] (c) Any county using the alternate residency confirmation procedure shall notify all voters of the procedure in the sample ballot pamphlet or in a separate mailing. The voter shall be given an opportunity to vote at a statewide primary or general election between the date of notice and the beginning of the alternate residency procedure."

no process or capacity either at the state level or at the county level to review, update or integrate data from the inactive voter file in each county into the active voter file."

Mott-Smith gave the following example of a hypothetical woman who changes her voter information several times during her life as the result of changing her residence, marrying, divorcing, and changing her party affiliation: "Mary Brown re-registers as Mary Lee Brown, then she moves in with her boyfriend and re-registers at the new address, then marries and re-registers as Mary Lee Green, then changes her party affiliation, then divorces and re-registers as Mary Brown, then moves and re-registers as Mary L. Brown, then remarries and re-registers as Mary White, and then moves again and re-registers. In this example, the voter could have as many as nine registrations on file in her county, one active and eight inactive."

Mott-Smith concluded that it would be "erroneous" to use such a person's duplicate listings on the inactive file of registered voters for the purpose of calculating whether a party qualifies to participate in a primary election pursuant to section 5100, subdivision (b).

Mott-Smith noted that voters on the inactive file retain the right to appear at their polling place, correct their record, and vote. But they do not receive election materials, and they are not included for determining political party eligibility. He opined that this was consistent with the congressional intent underlying the National Voter Registration Act.

The superior court ruled that, pursuant to section 2226, subdivision (a)(2), the Secretary of State correctly excluded inactive voters from the calculation called for by section 5100, subdivision (b), and that exclusion of PFP from participation in the March 2002 primary election did not violate federal law. Accordingly, it denied PFP's petition for writ of mandate.

## DISCUSSION

### I

As we have noted, section 5100, subdivision (b), provides that a political party is qualified to participate in a primary election if, at least 135 days before the election, "voters equal in number to at least 1 percent of the entire vote of the state at the last preceding gubernatorial election have declared their intention to affiliate with that party." And section 2226, subdivision (a)(2), states that voters listed on the inactive file of registered voters shall "not [be] included in calculations to determine the number of signatures

required for qualification of candidates and measures, precinct size, or other election administration related processes."

The administrative process of determining whether a political party qualifies to participate in a primary election pursuant to section 5100, subdivision (b), is by any understanding an "election administration related process[]." Therefore, an application of the general rules of statutory construction leads to the conclusion that, by virtue of section 2226, subdivision (a)(2), voters listed on the inactive file of registered voters must be excluded from the calculation to determine whether the number of signatures on voter registration forms declaring the voters' affiliations with a particular political party is sufficient to qualify that party for participation in a primary election pursuant to section 5100, subdivision (b).

As it did in the superior court, PFP contends the phrase "other election administration related processes" in section 2226, subdivision (a)(2), should not be interpreted to encompass the political party qualification determination made pursuant to section 5100, subdivision (b). In PFP's words, that determination "is simply too fundamental to the electoral rights of political parties and their members to be subsumed within such a general phrase." This is so, PFP argues, because (1) a voter listed on the inactive file continues to be a registered voter until his or her voter registration is cancelled pursuant to election laws, (2) under the circumstances of this case, excluding registered voters affiliated with PFP, but listed on the inactive file, from the calculation to determine if their political party qualifies to participate in a primary election "deprives those voters' chosen political party and its candidates of ballot access," and (3) this result necessarily denies such voters their "right . . . to vote for the part[y] and candidates of their choice."

In PFP's view, such an interpretation of the statute is wrong because it would "violate the First Amendment rights of Peace and Freedom Party voters and registrants whose names have been placed in the inactive file." We disagree.

"The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas." (*Timmons v. Twin Cities Area New Party* (1997) 520 U.S. 351, 357 [137 L.Ed.2d 589, 597, 117 S.Ct. 1364].) In determining whether an interpretation of a state election law would be unconstitutional, a court "must first consider the character and magnitude of the asserted injury to the rights protected by [the constitutional provision] that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of

those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." (*Anderson v. Celebrezze* (1983) 460 U.S. 780, 789 [75 L.Ed.2d 547, 558, 103 S.Ct. 1564].)

"[N]ot all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates. . . . '[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.' [Citation.] To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." (*Anderson v. Celebrezze, supra,* 460 U.S. at p. 788 [75 L.Ed.2d at p. 557], fn. omitted.)

PFP concedes that nothing in the relevant code sections, or in the superior court's interpretation of them, prevents a candidate registered as a member of PFP from being on the general election ballot. Rather, PFP only was prevented from being deemed a qualified political party eligible to participate in the primary election pursuant to section 5100, subdivision (b). It still could have qualified to participate in the primary election if it obtained petitions signed by registered voters, equal in number to 10 percent of the entire vote of the state at the last preceding gubernatorial election, declaring that they desired to have PFP participate in the primary election. (§ 5100, subd. (c).)

And, despite the failure to participate in the primary election, an individual PFP candidate could qualify to have his or her name on the general election ballot by nomination (§§ 8300, 8400), with the limitation that the designation "independent," rather than the party affiliation, would be printed on the ballot by the candidate's name. (§ 13105; *Libertarian Party v. Eu, supra,* 28 Cal.3d at p. 542.) Nothing prevents PFP from publishing the affiliation of its candidates; it simply cannot designate the affiliation on the ballot so long as it remains unqualified. (*Libertarian Party v. Eu, supra,* 28 Cal.3d at p. 545.) Requiring the candidate be identified as an independent, rather than a PFP candidate, "imposes an insubstantial burden" on the associational and voting rights of the candidate and the citizenry, and "serves a compelling state interest to protect the integrity and stability of the electoral process in California." (*Libertarian Party v. Eu, supra,* 28 Cal.3d at pp. 542, 545.)

In other words, the burden that PFP identifies concerning the associational rights of voters listed on the inactive file is minimal. (Cf. *Burdick v. Takushi*

(1992) 504 U.S. 428, 435–438 [119 L.Ed.2d 245, 254–256, 112 S.Ct. 2059] [prohibition against write-in candidates imposed only a limited burden on voters' rights to associate where the state's election laws provided other reasonable mechanisms through which a voter's candidate of choice may appear on the ballot].)

Moreover, the right to associate for political purposes through the ballot is not absolute. (*Burdick v. Takushi, supra,* 504 U.S. at p. 433 [119 L.Ed.2d at pp. 252–253].) "[T]o avoid burdening the general election ballot with frivolous candidacies, a State may require parties to demonstrate 'a significant modicum of support' before allowing their candidates a place on that ballot. [Citation.]" (*California Dem. Party v. Jones* (2000) 530 U.S. 567, 572 [147 L.Ed.2d 502, 508, 120 S.Ct. 2402].)

■ A "significant modicum of support" from eligible voters is what section 5100, subdivision (b), and section 2226, subdivision (a)(2), are designed to ensure. And they do so in a reasonable and nondiscriminatory manner. As demonstrated by the record in this case, persons listed on the inactive file of registered voters are excluded from the party qualification calculation under section 5100, subdivision (b), because information on the inactive voter list often is inaccurate with respect to eligibility to vote and often is duplicative of information on the active voter list. The refusal to include such unreliable information in determining the requisite one percent of voters is a reasonable restriction, and one that applies equally to all parties. ■ When an election law imposes only reasonable, nondiscriminatory restrictions upon the constitutional rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. (*Anderson v. Celebrezze, supra,* 460 U.S. at p. 788 [75 L.Ed.2d at p. 557]; accord, *Burdick v. Takushi, supra,* 504 U.S. at p. 434 [119 L.Ed.2d at p. 254].)

■ For all the reasons stated above, the Legislature's decision to exclude voters on the inactive file of registered voters from the determination of whether a political party qualifies to participate in a primary election pursuant to section 5100, subdivision (b), passes constitutional muster. Because information in the inactive file is unreliable and often duplicative of information in the file of active voters, the exclusion is a reasonable, nondiscriminatory restriction that furthers the state's compelling interest in protecting the integrity and stability of the electoral process in California.

## II

In a second attack on the trial court's interpretation of the statutory scheme, PFP claims that it violates the National Voter Registration Act (the NVRA). (42 U.S.C. § 1973gg et seq.) Again, we disagree.

Congress enacted the NVRA "(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office; [¶] (2) to . . . enhance[] the participation of eligible citizens as voters in elections for Federal office; [¶] (3) to protect the integrity of the electoral process; and [¶] (4) to ensure that accurate and current voter registration rolls are maintained." (42 U.S.C. § 1973gg(b).)

To effectuate its goals, the NVRA requires states to establish a simplified system for voter registration in federal elections by mail, at state offices designated as voter registration agencies, and on driver's license applications. (42 U.S.C. § 1973gg-3.) The NVRA delineates the manner in which these systems must operate, the kind of information required on voter registration forms, and the procedures by which states may remove citizens from the federal voter rolls. (42 U.S.C. §§ 1973gg-3(c)(2); 1973gg-6(a)(3), (4); 1973gg-7(b).) It strictly limits the removal of voters from the official list of voters based on their change of address or their failure to vote, and it requires the implementation of "fail-safe" voting procedures to ensure that voters will not be removed from registration rolls or prevented from voting due to clerical errors or the voter's own failure to reregister at a new address. (42 U.S.C. § 1973gg-6(b), (d), (e); *Welker v. Clarke* (3d Cir. 2001) 239 F.3d 596, 598–599.)

PFP claims the NVRA's regulation of the procedure for removing citizens from voter rolls is violated by the Secretary of State's interpretation of section 2226, subdivision (a)(2), and section 5100, subdivision (b). According to PFP, by disregarding voters on the inactive file in determining whether PFP was qualified to participate in the 2002 primary election, the Secretary of State in effect "dropped" those voters from the official voting list even though "the ability to have their chosen political party on the ballot is a very real part of their right to vote."

PFP does not identify which specific provision of the NVRA that it claims is contravened by the Secretary of State's refusal to consider voters on the inactive file of registered voters when determining whether a political party is qualified to participate in a primary election. It is true that the NVRA precludes election officials from removing voters from the official voting list absent certain conditions. (42 U.S.C. § 1973gg-6(d).)[2] But in this case, election officials have not removed the inactive voters from the list of voters

---

[2] Title 42 United States Code section 1973gg-6(d), which concerns the removal of names from voting rolls, provides that "(1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—[¶] (A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or [¶] (B)(i) has failed to respond to a notice described in paragraph (2); and [¶] (ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the

eligible to vote and cancelled their registration. Inactive voters may still show up, correct the record regarding their address, and vote—which comports with the NVRA. (42 U.S.C. § 1973gg-6(e).)[3]

The inactive file of registered voters is simply a pending file where election officials place the names of voters who may no longer be eligible to vote, until officials can establish with certainty whether grounds exist to cancel

registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice. [¶] (2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect: [¶] (A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B) of this section. If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters. [¶] (B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote. [¶] (3) A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection."

[3] Title 42 United States Code section 1973gg-6(e) provides: "(1) A registrant who has moved from an address in the area covered by a polling place to an address in the same area shall, notwithstanding failure to notify the registrar of the change of address prior to the date of an election, be permitted to vote at that polling place upon oral or written affirmation by the registrant of the change of address before an election official at that polling place. [¶] (2)(A) A registrant who has moved from an address in the area covered by one polling place to an address in an area covered by a second polling place within the same registrar's jurisdiction and the same congressional district and who has failed to notify the registrar of the change of address prior to the date of an election, at the option of the registrant—[¶] (i) shall be permitted to correct the voting records and vote at the registrant's former polling place, upon oral or written affirmation by the registrant of the new address before an election official at that polling place; or [¶] (ii)(I) shall be permitted to correct the voting records and vote at a central location within the same registrar's jurisdiction designated by the registrar where a list of eligible voters is maintained, upon written affirmation by the registrant of the new address on a standard form provided by the registrar at the central location; or [¶] (II) shall be permitted to correct the voting records for purposes of voting in future elections at the appropriate polling place for the current address and, if permitted by State law, shall be permitted to vote in the present election, upon confirmation by the registrant of the new address by such means as are required by law. [¶] (B) If State law permits the registrant to vote in the current election upon oral or written affirmation by the registrant of the new address at a polling place described in subparagraph (A)(i) or (A)(ii)(II), voting at the other locations described in subparagraph (A) need not be provided as options. [¶] (3) If the registration records indicate that a registrant has moved from an address in the area covered by a polling place, the registrant shall, upon oral or written affirmation by the registrant before an election official at that polling place that the registrant continues to reside at the address previously made known to the registrar, be permitted to vote at that polling place."

their voter registration. In effect, it is a safety net to prevent the premature cancellation of a voter's registration, thereby protecting the voter's right to vote.

The superior court's interpretation of the statutory scheme as requiring election officials to disregard voters on the inactive file of registered voters from the calculation necessary to qualify a political party to participate in a primary election pursuant to section 5100, subdivision (b), is consistent with the legislative intent underlying the NVRA. According to its legislative history: "Within the official list of eligible voters, notations (such as an asterisk or 'I' for inactive status) may be made of those eligible voters who have failed to respond to a notice under Section 8(d)(2) [codified in 42 U.S.C. § 1973gg-6(d)(2) (fn. 2, *ante*)]. The requirement that names with notations be maintained on the official list of eligible voters permits the State to decline to use these names in performing the type of routine, administrative responsibilities that do not impair the right of such voters to vote as set forth in the [NVRA] and as protected by the Voting Rights Act. *For example, those who have failed to respond to a Section 8(d)(2) notice need not be included for administrative purposes in determining the number of signatures that may be required under State law for ballot access*, the number of precincts that may be needed to service voters, or the number of ballots or voting machines that may be required in the administration of the voting process." (Sen.Rep. No. 103-6, 1st Sess., p. 32 (1993); italics added.)

 Accordingly, excluding information on the inactive file of registered voters from the calculation required under section 5100, subdivision (b), without interfering with the right of those voters to go to their polling place and vote, does not contravene the NVRA. Rather, excluding such information that may be erroneous or duplicative of registrations on the active list is consistent with the NVRA's purpose of protecting the integrity of the electoral process and ensuring that accurate and current voter registration rolls are maintained. (See 42 U.S.C. § 1973gg(b)(3), (4).)

## III

In sum, the trial court correctly interpreted section 2226, subdivision (a)(2), to preclude the use of voters on the inactive voter registration list in calculating whether a political party qualifies to participate in a primary election pursuant to section 5100, subdivision (b).

## DISPOSITION

The judgment is affirmed.

Blease, J., and Morrison, J., concurred.