COMMON CAUSE, et al., Plaintiffs,

v.

Brian KEMP, Secretary of State, Defendant.

CIVIL ACTION FILE NUMBER 1:16–cv–452–TCB

United States District Court, N.D. Georgia, Atlanta Division.

Signed March 17, 2017

Chad Lennon, Emmet J. Bondurant, II, Jason James Carter, Bondurant Mixson & Elmore, LLP, Atlanta, GA, for Plaintiffs.

Cristina Correia, Attorney General's Office–Atl Department of Law, Josiah Benjamin Heidt, Georgia Department of Law Office of the Attorney General, Julia B. Anderson, State of Georgia Law Department, Atlanta, GA, for Defendant.

## ORDER

Timothy C. Batten, Sr., United States District Judge

This case concerns Georgia's program for removing voters from county voter registration rolls due to a change in residency. Two non-profit organizations, Plaintiffs Common Cause and the Georgia State Conference of the NAACP, contend that the Georgia law violates federal voting-rights laws and the First Amendment to the U.S. Constitution. Currently before the Court is Defendant Brian Kemp's motion to dismiss for failure to state a claim [10].

## I. Factual Background [1]

At issue in this case is Georgia's program for removing ineligible voters from the voter registration rolls, codified primarily as O.C.G.A. § 21-2-234 ("Section 234"). The program operates as follows: during the first six months of each odd-numbered year, the secretary of state [2] compiles a list of voters with whom there has been "no contact" during the previous three years. § 21-2-234(a)(2). "No contact" is deemed to have been made when

the elector has not filed an updated voter registration card, has not filed a change of name or address, has not signed a petition which is required by law to be verified by the election superintendent of a county or municipality or the Secretary of State, has not signed a voter's certificate, and has not confirmed the elector's continuation at the same address during the preceding three calendar years.

§ 21-2-234(a)(1). The voters identified by the secretary are sent an address confirmation notice that includes a postage prepaid, preaddressed return card. § 21-2-234(c). The voter can use the card for address confirmation, or to inform the secretary that he or she has moved. § 21-2-234(d), (e), & (f). If the card is not returned within thirty days, then the voter's name is moved to the list of "inactive" voters. § 21-2-234(c)(2) & (g).

Voters on the inactive list can still vote. § 21-2-235(c). Any contact with the electoral system—including voting—would re-turn the person to the active voters list. If there is no contact from a voter on the inactive list for two consecutive federal general election cycles, then the voter is removed from the registration list. § 21-2-235(b).

## II. Procedural History

Georgia first enacted its voter-removal program in 1994. *See* 1994 Ga. Laws 1443. Pursuant to the then Section 5 of the Voting Rights Act of 1965, the U.S. Department of Justice reviewed the law and objected to the voter-removal program. *See* [1–1].

Georgia amended the law in 1997, putting into force the current version of Section 234. The DOJ again reviewed the law, and ultimately gave it preclearance under Section 5 of the Voting Rights Act. This preclearance meant that the DOJ found that the law "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." *Perry v. Perez*, 565 U.S. 388, 391, 132 S.Ct. 934, 181 L.Ed.2d 900 (2012) (quoting 42 U.S.C. § 1973c(a), now codified as 52 U.S.C. § 10304(a)).

On February 10, 2016, Common Cause and the Georgia State Conference of the NAACP brought suit on behalf of "Georgia voters whose right to vote has been prejudiced, or is at risk of being prejudiced, by Kemp's enforcement of [S]ection 234." [1] at ¶ 3. After the parties had briefed Kemp's motion to dismiss [10], the United States submitted a statement of interest in this case pursuant to 28 U.S.C. § 517.[3] In

---

1. At the motion-to-dismiss stage, the Court accepts as true the factual allegations in the complaint and construes them in the light most favorable to the non-moving party. *Belanger v. Salvation Army*, 556 F.3d 1153, 1155 (11th Cir. 2009).

2. Defendant Kemp is the current Secretary of State of Georgia.

3. "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of

its notice, the United States sides with Plaintiffs and argues that the voter-removal program violates federal voting-rights laws. The notice makes no mention of Plaintiffs' claim concerning violations of the First Amendment.

## III. Legal Standard

To survive a 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012). The Supreme Court has explained this standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citation omitted); *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012). Thus, a claim will survive a motion to dismiss only if the factual allegations in the complaint are "enough to raise a right to relief above the speculative level," and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. While all well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff, *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011), the Court need

not accept as true plaintiff's legal conclusions, including those couched as factual allegations, *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

## IV. Individual Capacity Claims

■ The complaint seeks equitable relief against Kemp in both his official and individual capacities. Claims seeking prospective equitable relief from a state agent performing official duties are considered official-capacity claims. *See Wu v. Thomas*, 863 F.2d 1543, 1550 (11th Cir. 1989); *Santhuff v. Seitz*, 385 Fed.Appx. 939, 942 n.3 (11th Cir. 2010).

Kemp moves to dismiss all claims against him in his individual capacity. Plaintiffs do not respond to this prong of Kemp's motion, but instead assert in a footnote that "Plaintiffs have properly sued Kemp in his individual capacity." [17] at 5 n.6 (citing *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278 (11th Cir. 2015)). Since Plaintiffs seek only equitable relief, the claims are considered brought against Kemp in his official capacity. *See Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 n.9 (11th Cir. 1995) ("Qualified immunity does not pertain to claims for injunctive or declaratory relief, because these claims are considered to be official capacity claims against the relevant governmental entity."). Accordingly, all claims against Kemp in his individual capacity will be dismissed.

## V. Compliance with Federal Voting Rights Laws

### A. Relevant Statutes

#### 1. The NVRA

The National Voter Registration Act of 1993 ("NVRA"), Pub. L. No. 103–31, 107

---

the United States in a suit pending in a court of the United States, or in a court of a State,

or to attend to any other interest of the United States."

Stat. 77 (codified as amended at 52 U.S.C. §§ 20501–11 (2016)), established procedures to "increase the number of eligible citizens who register to vote" and to "enhance[ ] the participation of eligible citizens as voters" in federal elections. 52 U.S.C. § 20501(b). The NVRA sought to simultaneously "protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." *Id.*

Section 8 of the NVRA sets standards for removing voters due to a change of residence. States are required to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of ... a change in ... residence." § 20507(a)(4). Programs enacted by states "shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." § 20507(b)(1).

States are prohibited from using voter-removal programs that "result in the removal of the name of any person from the official list of voters ... by reason of the person's failure to vote." § 20507(b)(2). When removing a voter from the rolls, states must abide by the notice provisions of subsections (c) and (d)(1)(B). *Id.* Those subsections provide a two-step notice process: first, the registrant must fail to respond to a postage-prepaid and pre-addressed residency confirmation card. §§ 20507(b)(2)(A) & (d)(1)–(2). Then, if the registrant "has not voted or appeared to vote in 2 or more consecutive general elections for Federal office," he or she may be removed. § 20507(b)(2)(B).

The NVRA expressly permits states to take account of the U.S. Postal Service's change-of-address database to determine which voters may have changed residence and therefore would be ineligible to vote.

§ 20507(c)(1). This "safe harbor" provision demonstrates a permissible way for a state to determine which voters should receive the residency confirmation notice.

## 2. HAVA

In 2002, Congress passed the Help America Vote Act ("HAVA"), Pub. L. No. 107–252, 116 Stat. 1666–1730. HAVA requires states to maintain "a single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). The registration list must be managed "in a uniform and nondiscriminatory manner." *Id.* Moreover, states are required to adhere to minimum standards for ensuring the accuracy of the voter registration list. § 21083(a)(4).

Specifically, HAVA requires states to maintain:

> A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters. Under such system, consistent with the [NVRA], registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed solely by reason of a failure to vote.

§ 21083(a)(4)(A). HAVA is explicit that removal of voters must be done "in accordance with the provisions of the [NVRA]." § 21083(a)(2)(A).

## B. Analysis

Plaintiffs do not contest that the residency-confirmation notices used under Section 234 comply with the NVRA, nor do they contest that the Georgia statute complies with the process for removing voters

who fail to return the card. Indeed, the language of Georgia's notice provision, and the language of the provision dealing with removal of voters who fail to return the card, closely mirrors the language of the NVRA. This means that the only issue before the Court is the legality of the process for determining which voters are subject to the residency confirmation process—the so-called "trigger provision."

There is a dearth of caselaw on this issue. The Court is aware of only one case—*A. Philip Randolph Inst. v. Husted*, 838 F.3d 699 (6th Cir. 2016)—which analyzed a state's trigger provision. The Sixth Circuit decision is a helpful comparison, but is not controlling, and the Court cannot abdicate its duty to abide by the Eleventh Circuit's rules for interpreting statutory provisions. Hence, it is an issue of first impression in this circuit whether a state may, under the NVRA and HAVA, send residency confirmation notices to registered voters based on their failure to vote.

In interpreting the meaning of a statute, the Court must first look to the plain language of the statute. *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1559 (11th Cir. 1989). In doing so, the Court may examine the "design of the statute as a whole and ... its object and policy." *Crandon v. United States*, 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). If the statute is unclear or ambiguous in any way, the court may look to legislative history and other extrinsic evidence. *See Cabalceta*, 883 F.2d at 1559. The Eleventh Circuit has also instructed that when the plain meaning of a statute produces an "unreasonable [result] plainly at variance with the policy of the legislation as a whole this Court has followed [the purpose of the

act], rather than the literal words." *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1529 (11th Cir. 1996) (quoting *Perry v. Commerce Loan Co.*, 383 U.S. 392, 400, 86 S.Ct. 852, 15 L.Ed.2d 827 (1966)). However, "[w]hen the import of the words Congress has used is clear ... we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language." *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000).

Kemp first argues that the notifications are not triggered by a failure to vote, but instead by a voter's failure to have contact with election officials. *See* [10–1] at 12–13. Importantly, the definition of "no contact" includes failure to sign a voter's certificate. O.C.G.A. § 21–2–234(a)(1). Because voter's certificates are assigned only at voting polls, O.C.G.A. § 21–2–402, a failure to sign such a certificate is a direct indication of a failure to vote. Hence, it is disingenuous to argue that the trigger provision does not take into account a person's failure to vote. And the inclusion of other, extraneous methods of establishing contact does not diminish the fact that failure to vote is necessary to trigger the notification provision. *Accord Husted*, 838 F.3d at 711 ("But the clause would have no teeth at all if states could circumvent it by simply including 'voting' in a disjunctive list of activities in which a registrant must fail to engage in order to 'trigger' the confirmation notice procedure.")

Yet contrary to Plaintiffs' assertions, this does not invalidate Section 234. The NVRA is silent on when and how a state may decide to send out the notifications. Other than the exemplar safe-harbor provision, there is no explicit statutory language governing "trigger" provisions.[4]

What remains instead is the prohibition in section (b)(1) that the process as a whole must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act." Plaintiffs argue that the law is not uniform because it "does not apply to the entire jurisdiction" and instead applies only to "those voters who have not voted in three years." [17] at 18. This argument is factually inaccurate: Georgia's voter–removal program begins with the entire population of voters and applies the same removal process to all voters. *See* O.C.G.A. § 21–2–234(a)(2) (directing the secretary of state to begin notification procedure by searching through "all electors whose names appear on the list of electors"). Moreover, Plaintiffs' reading of "uniform" would require states to send confirmation notifications to every registered voter, a result that contradicts the NVRA's exemplar safe-harbor provision.

The United States argues for additional requirements regarding the type of information a state may use to determine to whom it sends notifications, asserting that only "objective and reliable" information can be considered. *See* [19] at 12. But again, this language is nowhere to be found in the NVRA or HAVA.[5] The Court's role is to uphold the law as writ-

ten, not to usurp Congress's role in writing the law.[6]

Finally, Plaintiffs argue that because Section 234 takes into account voting history, it will necessarily "result in removal . . . by reason of the person's failure to vote." But this reading ignores the fact that voters are removed from the rolls only if they fail to respond to the notification in addition to having no contact with the electoral process for seven years. Plaintiffs would read the NVRA as prohibiting a state from ever considering a person's failure to vote when removing ineligible voters, but Congress did not write such a prohibition into the law, and the NVRA's removal process explicitly references a voter's failure to "vote[ ] or appear[ ] to vote in 2 or more consecutive general elections." 52 U.S.C. § 20507(b)(2)(B); *see also* § 20507(d)(1)(B)(ii). This is further supported by HAVA, which restates the provision as prohibiting states from removing a voter "*solely* by reason of a failure to vote." 52 U.S.C. § 21083(a)(4)(A) (emphasis added). Whether HAVA truly narrows the prohibition in the NVRA—as Kemp argues—or simply restates a fundamental principle of the NVRA—as Plaintiffs contend—does not affect the outcome, as Georgia's law does not violate the NVRA and thus does not violate HAVA's more

---

4. The language of the safe-harbor provision is permissive, not exclusive, meaning states may permissibly use other trigger methods. 52 U.S.C. § 20507(c)(1) ("A state *may* meet the requirements of subsection (a)(4) by . . . .") (emphasis added).

5. The United States found support for this assertion in *Welker v. Clarke*, 239 F.3d 596 (3d Cir. 2001). However, the United States acknowledges that this discussion was merely dicta, where the Third Circuit offered a brief summary of the NVRA for purposes of show-

ing how it contributed historically to Pennsylvania's laws for voter removal. *See id.* at 599.

6. The parties also disagree on whether the current position of the United States is inconsistent with its previous preclearance activities, *see* Part II.B, *supra*, or inconsistent with the position it has taken in other cases. *See* [22] at 10–15. Regardless of this history or the current position of the United States, the Court must apply the text of the statute as written. *See City of Arlington v. FCC*, 569 U.S. 290, 133 S.Ct. 1863, 1868, 185 L.Ed.2d 941 (2013); *Cabalceta* 883 F.2d at 1559.

narrowly-worded prohibition.[7]

In short, Georgia's removal process, which closely mirrors the language of the NVRA and HAVA, does not violate those statutes.

## VI. Compliance with the First Amendment

Plaintiffs claim that Section 234 violates "qualified Georgia voters' right not to vote, which is secured by the First Amendment to the United States Constitution." [1] at ¶ 41. Kemp argues that no such right exists, and that even if it did the statute does not impermissibly infringe on that right.

■ Plaintiffs find support for the right not to vote in *Hoffman v. Maryland*, 928 F.2d 646 (4th Cir. 1991). That case involved a pre-NVRA statute in Maryland that removed voters from the voter registration rolls if they failed to vote for five years. *Id.* at 647–48. However, the *Hoffman* court did not find that plaintiffs possessed a right not to vote. *Id.* at 648 ("We need not and do not decide the correctness of [the First Amendment argument] because, even if there is a right not to vote of

constitutional significance, it is not infringed upon by Maryland's purge statute."). Similarly, the Court here need not find that such a right exists, because even assuming that there exists a First Amendment right not to vote, Section 234 does not violate that right.

At the onset, the statute does not compel anyone to vote. Moreover, as previously discussed, a citizen's failure to vote will not, by itself, result in removal from the voter rolls. *See* Part V, *supra.* But, assuming that the right not to vote encompasses the right to remain wholly unresponsive to the electoral system while remaining on the voter registration rolls, Section 234 still does not impermissibly infringe on this right.

The parties disagree on what legal standard should be applied to analyze a law that infringes on the right not to vote. Plaintiffs assert that the right to be registered without voting "involves both speech and non-speech conduct ... [and] must satisfy the four-part test set forth in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)." [17] at 22.[8] However, the parties did not point to—and

---

7. There is support in HAVA for the position that the trigger must be based on something other than failure to vote: HAVA states that persons who fail to return the confirmation notice and who have not voted in two consecutive general Federal elections "shall be removed from the official list of eligible voters, *except* that no registrant may be removed solely by reason of failure to vote." 52 U.S.C. § 21083(a)(4)(A) (emphasis added). The word "except" could imply that some uses of the confirmation-notice process are lawful, but other uses of that process are unlawful because they result in the removal of a person solely by reason of failure to vote. Thus, a statute that combined the confirmation-notice process with a trigger based only on failure to vote would violate HAVA.

However, this argument fails because it overly-parses a single word of the statute. The

Court must interpret this language in the context of its subsection and the rest of the statute. *Crandon*, 494 U.S. at 158, 110 S.Ct. 997. Given the repeated mentions in HAVA that it does not supersede the provisions of the NVRA, the most harmonic reading of the language in question is that it restates a basic purpose of the NVRA. *See* 52 U.S.C. §§ 21083(a)(2)(A) (under HAVA, removals must be done "in accordance with the provisions of the [NVRA]") & 21083(a)(4)(A).

8. *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673, laid out a four-part test for laws that regulate both speech and non-speech conduct:

[A] government regulation is sufficiently justified if [(1)] it is within the constitutional power of the Government; [(2)] it furthers an important or substantial governmental interest; [(3)] the governmental in-

the Court is unaware of—any cases that applied the *O'Brien* test to a statute regulating voter conduct.[9]

*Hoffman*, which Plaintiffs cite in support, is the most illustrative case on this point. In *Hoffman*, 928 F.2d at 648–49, the Fourth Circuit referenced the *O'Brien* test when discussing a voter-removal statute, but ultimately decided to apply the test used for time, place or manner restrictions. Under that standard, " 'content-neutral' . . . regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Id.* The Court agrees with *Hoffman* that the time, place or manner restrictions are most appropriate to use in this case.

Applying that standard here, the Court finds that maintenance of accurate voter registration rolls is a substantial governmental interest, as mandated under the NVRA and HAVA. *See* 52 U.S.C. § 20501(b)(4) & § 21083(a)(4). Georgia's statute is designed to serve that interest, and it does nothing to limit the vast array of other avenues of political communication. Moreover, the statute in question in *Hoffman* was found *not* to violate the purported right not to vote. 928 F.2d at 649. Since the Maryland law in *Hoffman* un-

questionably removed voters based solely on their failure to vote, *see id.* at 647–48, Section 234 would similarly pass the First Amendment test implemented by the *Hoffman* court.

■ Section 234 also passes muster under the two standards advocated by Kemp. First, in a forum-based analysis, Kemp argues that presence on the voter rolls would be considered, at most, a non-public or limited public forum. [10–1] at 20. Regulations in those fora need only be reasonable and viewpoint-neutral,[10] and the Court agrees that Section 234 passes this test. Next, Kemp analogizes this case to ballot-access cases where the right to vote is implicated. [10–1] at 22. In such cases, "[r]egulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.' " *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)). The regulation at issue here is most similar to the "lesser" or "limited" burden upheld in *Burdick*, where Hawaii prohibit-

terest is unrelated to the suppression of free expression; and [(4)] the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.
Plaintiffs assert that Gerogia's statute fails the second and fourth prongs of the *O'Brien* test.

9. *See, e.g., Rosario v. Rockefeller*, 410 U.S. 752, 761, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (upholding pre-election registration process because it "tied to a particularized legitimate purpose, and is in no sense invidious or arbitrary"); *Stein v. Ala. Sec'y of State*, 774 F.3d 689, 691 (11th Cir. 2014) (upholding ballot

access ordinance where Plaintiffs failed to show "that the legitimate, nondiscriminatory reasons for the State's restrictions on petition-based ballot access unconstitutionally burdens their associational rights").

10. *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679 n.11, 130 S.Ct. 2971, 177 L.Ed.2d 838 (2010); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).

ed write-in voting. *See Burdick,* 504 U.S. at 437, 112 S.Ct. 2059. Because the Georgia statute is reasonable and nondiscriminatory, it passes this balancing test.

Thus, even if there existed a right not to vote, Georgia's statute does not impermissibly infringe upon that right.

### VII.   Conclusion

For the foregoing reasons, Kemp's motion to dismiss [10] is GRANTED.

IT IS SO ORDERED this 17th day of March, 2017.