[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12004

_____

D.C. Docket No. 2:13-cv-00178-WKW-WC

STATE OF ALABAMA,

Plaintiff - Appellant,

versus

PCI GAMING AUTHORITY,
BUFORD ROLIN,
STEPHANIE BRYAN,
ROBERT MCGHEE,
DAVID GEHMAN,
sued in their official capacity, et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(September 3, 2015)

Before MARCUS, JILL PRYOR and EBEL,[*] Circuit Judges.

---

[*] Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

JILL PRYOR, Circuit Judge:

Alabama sued under state and federal law to enjoin gaming at casinos owned by the Poarch Band of Creek Indians (the "Tribe") and located on Indian lands within the state's borders.[1]  As the Tribe itself is unquestionably immune from suit, Alabama instead named as defendants PCI Gaming Authority ("PCI"), an entity wholly owned by the Tribe that operates the casinos, and tribal officials in their official capacity.

Alabama claims that the gaming at the casinos constitutes a public nuisance under Alabama law and should be enjoined.  It puts forth two novel theories to explain why its state law applies to the Tribe's casinos.  First, Alabama asserts that the Secretary of the Interior (the "Secretary") lacked authority to take land into trust for the Tribe; therefore, the Tribe's casinos are not located on Indian lands, and Alabama may regulate the gaming there.  Second, Alabama contends that by incorporating state laws governing gambling into federal law, 18 U.S.C. § 1166 creates a right of action for a state to sue in federal court to enforce its laws on Indian lands.  The district court rejected these arguments and dismissed the action on the grounds that the defendants were entitled to tribal immunity on nearly all of Alabama's claims and Alabama failed to state a claim for relief.  After careful

---

[1] Although we are mindful that the terms "Native American" and "American Indian" may be preferable, we use the term "Indian" throughout this opinion because it is the term used in the statutes at issue in this appeal and in the parties' briefs.

consideration of the briefs and the record, and with the benefit of oral argument, we affirm the district court's judgment in favor of the defendants.

## I.    FEDERAL REGULATION OF GAMING ON INDIAN LANDS

Congress passed the Indian Gaming Regulatory Act ("IGRA"), 18 U.S.C. §§ 1166-68, 25 U.S.C. §§ 2701-21, to address "the rapidly expanding field of Indian gaming." *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians* (*Tamiami II*), 63 F.3d 1030, 1032 (11th Cir. 1995);[2] *see also* 25 U.S.C. § 2701(1) (explaining IGRA was enacted because "numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands").  IGRA was enacted in response to the United States Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that because Congress had not regulated Indian gaming, the states lacked authority to regulate gaming on Indian lands.  *See Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2034 (2014).[3]

IGRA regulates gaming that occurs on Indian lands, which include "any lands title to which is [] held in trust by the United States for the benefit of any Indian tribe . . . and over which an Indian tribe exercises governmental power."

---

[2] *Tamiami*, a case involving a contractual dispute over the management of a bingo gaming facility on Indian lands, came before our Court three times.  The first *Tamiami* opinion is irrelevant to the issues presently before us.  *See Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians*, 999 F.2d 503 (11th Cir. 1993).

[3] The lack of legislation regulating gaming on Indian lands meant that states could not limit such gaming because "unless and until Congress acts, [] tribes retain their historic sovereign authority."  *Bay Mills*, 134 S. Ct. at 2030 (internal quotation marks omitted).

25 U.S.C. § 2703(4)(B).[4]  IGRA does not govern gaming that occurs outside of

Indian lands; a state's authority to regulate such gaming is "capacious."  *Bay Mills*,

134 S. Ct. at 2034.

As for gaming on Indian lands, IGRA provides "a comprehensive approach

to the controversial subject of regulating tribal gaming, [and strikes] a careful

balance among federal, state, and tribal interests."  *Florida v. Seminole Tribe of*

*Fla. (Seminole Tribe II)*, 181 F.3d 1237, 1247 (11th Cir. 1999).[5]  IGRA "divides

gaming on Indian lands into three classes—I, II, and III—and provides a different

regulatory scheme for each class."[6]  *Seminole Tribe of Fla. v. Florida (Seminole*

*Tribe I)*, 517 U.S. 44, 48 (1996).  IGRA defines class II gaming to include bingo

and permits the use of "electronic, computer, or other technologic aids" in

---

[4] A separate statute, the Indian Reorganization Act ("IRA"), 25 U.S.C. §§ 461-79, authorizes the Secretary to accept lands into trust for "the purpose of providing land for Indians." 25 U.S.C. § 465.  IRA defines Indians as "persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction."  *Id.* § 479.

[5] In *Florida v. Seminole Tribe of Florida*, Florida sued the Seminole tribe and its chairperson, seeking to enjoin the tribe from engaging in unlawful gaming.  181 F.3d at 1239. Florida filed its lawsuit shortly after the Supreme Court held that a lawsuit in which the Seminole tribe had sued Florida and its governor under IGRA was barred by the state's sovereign immunity.  *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44 (1996).  Although the two decisions were issued by different courts in different cases, they are related because both cases involved the same parties and dealt with the state's attempts to regulate gaming on the tribe's lands. Because both decisions are central to our analysis in this case and for clarity, we refer to the Supreme Court's decision as *Seminole Tribe I* and ours as *Seminole Tribe II*.

[6] Class I gaming, not at issue here, includes "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations."  25 U.S.C. § 2703(6).  Class I gaming is "within the exclusive jurisdiction of the Indian tribes."  *Id.* § 2710(a)(1).

4

connection with the game.  25 U.S.C. § 2703(7)(A)(i).[7]  Class III gaming is "all forms of gaming that are not class I gaming or class II gaming" and includes slot machines and other casino games.  25 U.S.C. § 2703(8); *Seminole Tribe I*, 517 U.S. at 48.

Under IGRA, the extent to which a tribe may engage in class II or class III gaming depends on how the state where the Indian lands are located has chosen to regulate such games in the state as a whole.[8]  With respect to class II and class III gaming, IGRA permits a tribe to conduct each class of gaming only if such gaming is allowed in some form within the state where the Indian lands are located.  25 U.S.C. § 2710(b)(1), (d)(1) (allowing class II or class III gaming when the state where the gaming occurs "permits such gaming for any purpose by any person, organization or entity").  IGRA imposes an additional requirement before a tribe can conduct class III gaming:  the tribe and state must agree to a compact regulating the gaming, which the Secretary must approve.  *Id.* § 2710(d)(1), (d)(3). A state must negotiate a tribal-state compact governing class III gaming in good faith.  *Id.* § 2710(d)(3)(A).

---

[7] Class II gaming also includes card games that either "(I) are explicitly authorized by the laws of the State, or (II) are not explicitly prohibited by the laws of the State and are played at any location in the State."  25 U.S.C. § 2703(7)(A)(ii).

[8] IGRA also requires a tribe to adopt an ordinance or resolution, approved by the chairperson of the National Indian Gaming Commission, authorizing class II or class III gaming. 25 U.S.C. § 2710(b)(1), (d)(1).  The Commission consists of three members and operates within the Department of the Interior.  *See id.* § 2704.

IGRA expressly provides both tribes and states with limited express rights of action to sue in federal court with respect to tribal-state compacts.  If a state fails to negotiate a tribal-state compact in good faith, a tribe may bring a civil action against the state in federal court.  *Id.* § 2710(d)(7)(A)(i).  But IGRA limits the remedies available to the tribe in such an action.  The tribe may not obtain broad injunctive relief; the ultimate remedy available is that the Secretary may set forth the terms under which the tribe may engage in class III gaming on Indian lands within the state.  *Id.* § 2710(d)(7)(B)(iv), (vii).  IGRA also expressly provides states with a cause of action to sue to enjoin "class III gaming activity located on Indian lands" that is "conducted in violation of any Tribal-State compact."  *Id.* § 2710(d)(7)(A)(ii).  No remedy other than an injunction is provided.  *See id.*

IGRA authorizes the National Indian Gaming Commission (the "NIGC") to regulate gaming on Indian lands.  The NIGC is tasked with "monitor[ing] class II gaming conducted on Indian lands on a continuing basis" and is authorized to "inspect and examine" the premises where class II gaming occurs.[9]  *Id.* § 2706(b)(1), (b)(2).  In addition, the NIGC may fine a tribe or close a gaming facility if it finds a tribe has conducted class III gaming on Indian lands without a compact.  *Id.* § 2713(a)(1), (b).

---

[9] A tribe may be exempt from inspection and examination by the NIGC if the tribe has a certificate for self-regulation.  25 U.S.C. § 2710(c)(5)

6

In addition to this civil and regulatory scheme governing gaming on Indian lands, IGRA includes three provisions codified in the criminal code, only one of which is relevant here.[10]  Section 1166, titled "Gambling in Indian country," applies to class III gaming conducted in the absence of a tribal-state compact.  18 U.S.C. § 1166(c).  This section incorporates "all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto" into federal law.  *Id.* § 1166(a).  These state laws "shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State."[11]  *Id.*  Section 1166 makes it a federal crime to commit an act or omission involving gambling where the conduct "would be punishable if committed or omitted within the jurisdiction of the State in which the act or omission occurred," under the state's laws "governing the licensing, regulation, or prohibition of gambling."  *Id.* § 1166(b).  The punishment for this federal crime is the same as the punishment would be under state law for the state

---

[10] The two other provisions criminalize theft from, and theft by officers or employees of, gaming establishments on Indian lands.  *See* 18 U.S.C. §§ 1167-68.

[11] "Indian country" is defined as:

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151.  Lands taken into trust by the Secretary under IRA are considered part of Indian country.  *See United States v. John*, 437 U.S. 634, 648-50 (1978).

7

crime.  The United States has the exclusive jurisdiction to bring criminal prosecutions for violations of § 1166(b).  *Id.* § 1166(d).

## II.    FACTUAL BACKGROUND

The Tribe owns three casinos located within the state of Alabama, all of which are situated on lands held in trust by the United States for the benefit of the Tribe.[12]  At the casinos, there are hundreds of machines that appear to be electronic bingo games but, Alabama alleges, are actually slot machines.  These gaming devices "play like, look like, sound like, and attract the same class of customers as acknowledged slot machines," and nearly identical machines are marketed as slot machines.[13]  First Am. Compl. at 6 ¶¶ 17-18 (Doc. 10).[14]

Under IGRA, the Tribe may operate bingo games but not slot machines at the casinos.  Although the Alabama Constitution generally prohibits bingo gaming, Ala. Const. art. IV, § 65, nonprofit entities and private clubs are permitted to operate bingo games for prizes or money in some towns and counties for charitable, educational, or other lawful purposes.  *See* Ala. Const. amends. 386-87, 413, 440, 506, 508, 542, 549-50, 565, 569, 599, 612, 674, 692, 732, 743-44.

---

[12] The federal government has recognized the Tribe "as an Indian tribe within the meaning of Federal law."  Final Determination for Fed. Acknowledgment of the Poarch Band of Creeks, 49 Fed. Reg. 24,083-01 (June 11, 1984).  The lands on which the three casinos are located were taken into trust for the Tribe in 1984, 1992, and 1995, respectively.

[13] In reviewing a district court's order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we must accept as true the complaint's factual allegations.  *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003) (per curiam).

[14] Citations to "Doc." herein refer to docket entries in the district court record in this case.

8

Because some bingo gaming is allowed under Alabama law and the NIGC Chairperson approved the Tribe's ordinance to participate in class II gaming, the Tribe may operate bingo games at its casinos. The Tribe may not, however, operate slot machines at its casinos because Alabama prohibits the operation of slot machines within the state. *See, e.g.*, Ala. Code § 13A-12-27(a)(1) (criminalizing the possession of slot machines).

Alabama originally sued PCI as well as thirteen individuals (the "Individual Defendants")[15] in state court, seeking an injunction and a declaratory judgment on the ground that the operation of illegal slot machines at the Tribe's three casinos constitutes a public nuisance under Alabama law. *See* Ala. Code § 6-5-121 (authorizing Alabama to bring a lawsuit to abate a public nuisance). After the defendants removed the action to federal court, Alabama amended its complaint to add a claim based on the same alleged state law violation (public nuisance) under IGRA, 18 U.S.C. § 1166.[16] Alabama alleged that because the tribe was conducting

_____

[15] Neither party disputes that all of the Individual Defendants are tribal officers; some serve as members of the Tribe's Tribal Council and others as directors of PCI.

[16] At the time the case was removed, Alabama had asserted only a state law public nuisance claim. The defendants removed the case pursuant to 28 U.S.C. §§ 1331, 1441, and 1442, asserting that subject matter jurisdiction existed because: (1) federal law completely preempted Alabama's state law claim; (2) the case raised "substantial, actually disputed, federal issues regarding the status of Indian lands held in trust"; and (3) Alabama's claims "call into question the validity of federal law(s), regulations, and administrative decisions pertaining to Indian tribal lands" given that the defendants' interests "in the Indian tribal lands are derived from the federal Secretary of the Interior." Notice of Removal at 1-3 (Doc. 1). Once in federal court, Alabama did not seek remand but instead amended its complaint to add the IGRA claim; at that point the amended complaint clearly invoked federal question jurisdiction. We express no

9

unauthorized class III gaming, the state could sue under § 1166 to enjoin the gaming.

The defendants moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  The district court granted the motion, dismissing the amended complaint on the following grounds: (1) lack of subject matter jurisdiction as to the state law public nuisance claim because IGRA completely preempts it;[17] (2) lack of subject matter jurisdiction as to all claims against PCI based on tribal sovereign immunity; (3) lack of subject matter jurisdiction as to the state law public nuisance claim against the Individual Defendants based on tribal sovereign immunity; (4) alternatively, failure to state a claim upon which relief can be granted as to the state law public nuisance claim because the gaming occurs on Indian lands, where IGRA expressly preempts state law; and (5) failure to state a claim as to the federal claim because IGRA, through

opinion on whether the defendants properly removed the case because, even if federal question jurisdiction did not exist at the time of removal, it clearly existed when the district court entered its judgment.  *See Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 64 (1996) (even if a case was improperly removed, it "is not fatal to the ensuing adjudication if federal jurisdictional requirements are met at the time judgment is entered"); *see also H&D Tire & Auto.-Hardware, Inc. v. Pitney Bowes Inc.*, 227 F.3d 326, 328 (5th Cir. 2000) ("Even if a federal court lacks jurisdiction at the time of removal and regardless of whether there was an objection to the removal, the judgment will stand if the court had jurisdiction at the time it entered judgment. If, however, the court lacked jurisdiction both at the time of removal and judgment, the judgment cannot stand." (internal citations omitted)).

[17] Although the defendants took the position in the district court that IGRA completely preempts state law, they raise no complete preemption argument on appeal and thus have abandoned this argument.  *See Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 n.16 (11th Cir. 1995).  We therefore do not address this issue.

10

§ 1166, does not create a right of action for Alabama to sue tribal officials. This is Alabama's appeal.

### III.    STANDARD OF REVIEW

We are called upon here to review the district court's determinations that (1) PCI was entitled to tribal sovereign immunity on all claims; (2) the Individual Defendants were entitled to tribal sovereign immunity as to Alabama's state law claim but not its claim under IGRA; and (3) Alabama failed to state a claim for relief. We review each of these rulings *de novo*. *See Seminole Tribe II*, 181 F.3d at 1240-41.

### IV.    TRIBAL SOVEREIGN IMMUNITY

We have an obligation to make sure we have jurisdiction to hear this action, which requires us to first consider whether the defendants enjoy tribal sovereign immunity from Alabama's claims. *See id.* at 1240-41 n.4; *Taylor v. Ala. Intertribal Council Title IV J.T.P.A.*, 261 F.3d 1032, 1034 (11th Cir. 2001). We conclude that PCI is entitled to tribal sovereign immunity on all claims against it, and the Individual Defendants are entitled to tribal sovereign immunity on Alabama's state law claim, but not its claim under IGRA.

"Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) (quoting

11

*Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831)).  Indian tribes therefore

possess "'the common-law immunity from suit traditionally enjoyed by sovereign

powers.'"  *Seminole Tribe II*, 181 F.3d at 1241 (quoting *Santa Clara Pueblo v.

Martinez*, 436 U.S. 49, 58 (1978)).  A suit against a tribe is "barred unless the tribe

clearly waived its immunity or Congress expressly abrogated that immunity by

authorizing the suit."  *Id.*  Although the Supreme Court has expressed doubts about

"the wisdom of" tribal immunity, the Court nonetheless has recognized that "the

doctrine of tribal immunity is settled law and controls" unless and until Congress

decides to limit tribal immunity.  *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523

U.S. 751, 756-58 (1998); *see also Bay Mills*, 134 S. Ct. at 2037 ("[I]t is

fundamentally Congress's job, not ours, to determine whether or how to limit tribal

immunity.").  Here, the Tribe has not waived its immunity and Congress has not

expressly abrogated it.  The question we face is whether PCI and the Individual

Defendants also enjoy tribal immunity.

### A.    PCI

Alabama argues that PCI does not share in the Tribe's immunity because

PCI is a business entity separate from the Tribe that engages in commercial, not

governing, activities.  We conclude that PCI shares in the Tribe's immunity because it operates as an arm of the Tribe.[18]

First, the Supreme Court has not "drawn a distinction between governmental and commercial activities of a tribe" when deciding whether there is tribal immunity from suit.  *Kiowa Tribe*, 523 U.S. at 754-55.  Second, we agree with our sister circuits that have concluded that an entity that functions as an arm of a tribe shares in the tribe's immunity.  *See Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006) ("When the tribe establishes an entity to conduct certain activities, the entity is immune if it functions as an arm of the tribe."); *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 29 (1st Cir. 2000) ("The Authority, as an arm of the Tribe, enjoys the full extent of the Tribe's sovereign immunity."); *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000) (holding that entity that "serves as an arm of the tribe . . . is thus entitled to tribal sovereign immunity").  Because Alabama does not dispute that PCI operates as an arm of the Tribe, PCI shares the Tribe's immunity.

---

[18] The parties disagree about whether we held in *Freemanville Water System, Inc. v. Poarch Band of Creek Indians* that PCI shares in the Tribe's immunity.  563 F.3d 1205 (11th Cir. 2009).  In *Freemanville*, we decided that the Tribe and PCI enjoyed immunity from a claim that the Tribe's planned construction of a water system violated federal law.  In reaching that conclusion, we did not address whether PCI shares in the Tribe's immunity because the parties agreed that PCI shared in whatever immunity the Tribe enjoyed.  *Id.* at 1207 n.1.  As the question of whether PCI shares in the Tribe's immunity was not before us in *Freemanville*, here we address the issue for the first time.

13

### B.     Individual Defendants

#### 1.     Immunity as to IGRA Claim

We now turn to whether the Individual Defendants, individuals sued in their official capacity, enjoy immunity from Alabama's IGRA claim.  We hold that they do not.  Because Alabama alleges that the Individual Defendants are committing ongoing violations of IGRA, a federal law, and seeks declaratory and injunctive relief to stop the violations, the officials are not entitled to immunity.

In *Ex parte Young*, the Supreme Court recognized an exception to sovereign immunity in lawsuits against state officials for prospective declaratory or injunctive relief to stop ongoing violations of federal law.  209 U.S. 123, 155-56 (1908).  Under the legal fiction established in *Ex Parte Young*, when a state official violates federal law, he is stripped of his official or representative character and no longer immune from suit.  *Id.* at 159-60.  "An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction," such that the state officer is not immune from suit. *Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997).

We previously have extended the *Ex parte Young* doctrine to tribal officials. Although tribal officials are generally entitled to immunity for acts taken in their official capacity and within the scope of their authority, "they are subject to suit under the doctrine of *Ex parte Young* when they act beyond their authority" by

14

violating a federal statute. *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians* (*Tamiami III*), 177 F.3d 1212, 1225 (11th Cir. 1999). Because Alabama alleges that the Individual Defendants are engaged in ongoing conduct that violates federal law, the Individual Defendants are not entitled to immunity.[19]

In an attempt to avoid the application of *Ex parte Young*, the Individual Defendants argue that the "Supreme Court [in *Seminole Tribe I*] held that the *Ex parte Young* theory is not available in IGRA enforcement actions between tribes and states." Appellees' Br. at 52. We disagree. The Supreme Court's decision in *Seminole Tribe I* addressed only whether *Ex parte Young* permitted a state official to be sued under the provision of IGRA that gives a tribe an express cause of action to sue to compel a state to negotiate in good faith a tribal-state compact governing class III gaming based on the limited remedial scheme available to a tribe to vindicate this right. *See* 517 U.S. at 47. *Seminole Tribe I* neither addressed nor decided whether state and tribal officials are immune from other IGRA-based

---

[19] Several other circuits similarly have held that the *Ex parte Young* doctrine applies to make tribal officials subject to suit to enjoin ongoing violations of the Constitution or federal law. *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011) ("recognizing *Ex parte Young* as an exception not just to state sovereign immunity but also to tribal sovereign immunity"); *Vann v. Kempthorne*, 534 F.3d 741, 750 (D.C. Cir. 2008) ("Faced with allegations of ongoing constitutional and treaty violations, and a prospective request for injunctive relief, officers of the Cherokee Nation cannot seek shelter in the tribe's sovereign immunity"); *Burlington N.& Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1092 (9th Cir. 2007) (explaining that the *Ex parte Young* doctrine "has been extended to tribal officials sued in their official capacity"); *N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty.*, 991 F.2d 458, 460 (8th Cir. 1993) ("*Ex parte Young* applies to the sovereign immunity of Indian tribes, just as it does to state sovereign immunity.").

claims to enforce rights for which the statute does not set forth such a detailed, limited remedial scheme.

In *Seminole Tribe I*, the tribe sued the governor of Florida in his official capacity, as well as the state of Florida, seeking injunctive relief after the governor refused to negotiate a tribal-state compact governing class III gaming. *Id.* at 51-52. The Supreme Court held that the Eleventh Amendment barred the suit against Florida and that the governor also enjoyed immunity. The *Ex parte Young* doctrine did not apply to the tribe's claim against the governor for failing to negotiate a compact in good faith because "Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right." *Id.* at 72, 74. Under this detailed scheme, a tribe has only a "modest" remedy when a state fails to negotiate a compact in good faith:

> [T]he only remedy prescribed is an order directing the State and the Indian tribe to conclude a compact within 60 days. And if the parties disregard the court's order and fail to conclude a compact within the 60–day period, the only sanction is that each party then must submit a proposed compact to a mediator who selects the one which best embodies the terms of the Act. Finally, if the State fails to accept the compact selected by the mediator, the only sanction against it is that the mediator shall notify the Secretary of the Interior who then must prescribe regulations governing class III gaming on the tribal lands at issue.

*Id.* at 74-75 (construing 25 U.S.C. § 2710(d)(7)). The Supreme Court explained that applying the *Ex parte Young* doctrine—which would permit a tribe to sue a

16

state official for broad injunctive relief to compel negotiations—would be inconsistent with and undermine the limited remedy IGRA sets forth. *Id.* at 75 ("[I]t is difficult to see why an Indian tribe would suffer through the intricate scheme of § 2710(d)(7) when more complete and more immediate relief would be available under *Ex parte Young*.").

The Supreme Court did not address the argument that the Individual Defendants raise here:  whether the *Ex parte Young* doctrine applies when a state sues a tribal official under 18 U.S.C. § 1166 seeking to enjoin class III gaming. Reviewing this issue of first impression, we hold that the *Ex parte Young* doctrine applies to a claim under § 1166.  In *Seminole Tribe I*, the Supreme Court recognized an exception to *Ex parte Young* that applies when a federal statute contains a detailed remedial scheme. *Id.* at 74-75; see *also Vann v. Kempthorne*, 534 F.3d 741, 755 (D.C. Cir. 2008) (explaining that the *Seminole Tribe I* exception applies only "if we can discern an intent to displace *Ex parte Young* suits through the establishment of a more limited remedial regime").  As described in more detail in Section V, *infra*, in § 1166 Congress created no remedy for a state to enforce directly its gaming laws on Indian lands, much less a detailed remedial scheme.  In the absence of such a remedial regime, we cannot conclude that Congress intended § 1166 to displace *Ex parte Young*.

17

2.      Immunity as to State Law Claim

We now address whether tribal immunity bars Alabama's state law nuisance claim brought against the Individual Defendants in their official capacity.  First we consider whether the Individual Defendants enjoy immunity from Alabama's state law claim.  We then turn to Alabama's argument that the Individual Defendants waived their immunity from the state law claim when they removed the case to federal court.

a.      Scope of Immunity

Federal courts have long recognized that state officials are immune from state law claims brought against them in their official capacity because the *Ex parte Young* doctrine does not reach such claims.  *See Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1305 n.15 (11th Cir. 2011).  The Supreme Court has explained that the rationale for the *Ex parte Young* doctrine "rests on the need to promote the vindication of federal rights," but in a case alleging that a state official has violated state law, this federal interest "disappears." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105-06 (1984).  State officials are immune from suit in federal court for claims arising under state law because "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.* at 106.

18

The immunity tribal officials enjoy from state law claims brought in federal court is narrower than the immunity of state officials from such claims, however. Specifically, tribal officials may be subject to suit in federal court for violations of state law under the fiction of *Ex parte Young* when their conduct occurs outside of Indian lands.  *See Bay Mills*, 134 S. Ct. at 2034-35.  In *Bay Mills*, the Supreme Court held that a *tribe* enjoyed immunity from suit by a state to enjoin alleged illegal gaming occurring at a casino that was not on Indian lands.  However, the state had other remedies and could sue "*tribal officials* . . . (rather than the Tribe itself) seeking an injunction for, say, gambling without a license [under state law]." *Id.* at 2035 (emphasis added).  This is because "a State, on its own lands, has many other powers over tribal gaming that it does not possess (absent consent) in Indian territory"; when not on Indian lands, members of a tribe, including tribal officials, "are subject to any generally applicable state law."  *Id.* at 2034-35.  And tribal officials are not immune from a state law claim seeking to enjoin gaming because "analogizing to *Ex parte Young*, tribal immunity does not bar such a suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct" under state law that occurs off Indian lands.  *Id.* at 2035 (internal citation omitted).

Alabama acknowledges that the Individual Defendants enjoy immunity from its state law claim if the casinos are located on Indian lands.  While conceding that

19

the Secretary took the lands where the casinos are located into trust for the Tribe, Alabama argues that under the Supreme Court's decision in *Carcieri v. Salazar*, 555 U.S. 379 (2009), the Tribe's casinos are not located on Indian lands because the Secretary lacked authority to take land into trust on behalf of the Tribe under IRA. We reject this argument because Alabama cannot raise a collateral challenge to the Secretary's authority to take lands into trust (and consequently, the status of the Tribe's lands) in this lawsuit. We therefore conclude that the Individual Defendants are entitled to immunity on Alabama's state law claim.

In *Carcieri*, the Secretary decided to take a parcel of land into trust for the Narragansett Indian tribe. Rhode Island appealed the decision to the Interior Board of Indian Appeals, which upheld the Secretary's decision. Rhode Island then sought review of the agency action in federal court under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. The Supreme Court was presented with the question of whether IRA authorized the Secretary to take lands into trust on behalf of the Narragansett tribe, which had not been federally recognized when IRA was enacted in 1934. As described above, IRA authorized the Secretary to take lands into trust "for the purpose of providing land for Indians," defining Indians as "persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." 25 U.S.C. §§ 465, 479. Because "the term 'now under federal jurisdiction' in § 479 unambiguously refer[red] to those tribes

20

that were under the federal jurisdiction of the United States when [] IRA was enacted in 1934," the Supreme Court held the Secretary lacked authority to take land into trust for a tribe that was not under federal jurisdiction in 1934. 555 U.S. at 395-96.

But the Supreme Court's decision in *Carcieri* holding that the Secretary lacked authority to take land into trust for the Narragansett tribe in a lawsuit against the Secretary raising a timely APA claim does not mean that Alabama may collaterally attack the Secretary's authority to take lands into trust for the Tribe in this case. Unlike Rhode Island in *Carcieri*, Alabama has not brought an APA claim against the Secretary. Because *Carcieri* involved a timely challenge under the APA, the Supreme Court did not address whether the Secretary's authority to take land into trust may be reviewed outside an APA action.[20]

The proper vehicle for Alabama to challenge the Secretary's decisions to take land into trust for the Tribe is an APA claim. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2208 (2012) (characterizing a challenge to the Secretary's land-into-trust decision as a "garden-variety APA claim"). We hold that Alabama cannot raise in this lawsuit a collateral challenge to the Secretary's authority to take the lands at issue into trust.

---

[20] The Supreme Court explained that its decision did not address the status of lands the Secretary had previously taken into trust for the Narragansett tribe. *Carcieri*, 555 U.S. at 385 n.3.

We find persuasive the opinion of the Ninth Circuit sitting en banc, which recently held that California could not raise a collateral attack—that is, make a challenge outside an APA claim—to the Secretary's authority to take lands into trust for an Indian tribe. *Big Lagoon Rancheria v. California*, 789 F.3d 947 (9th Cir. 2015) (en banc). In *Big Lagoon*, a tribe sued California contending that the state had failed to negotiate in good faith a tribal-state compact governing class III gaming. *Id.* at 952. California argued, based on *Carcieri*, that it had no obligation to negotiate a compact because the tribe was not under federal jurisdiction as of 1934; thus, the tribe's casinos were not located on Indian lands. *Id.* The Ninth Circuit rejected California's reliance on *Carcieri*, which did not "address whether the [Secretary's] entrustment decisions can be challenged outside an action brought under the APA or outside the statute of limitations for APA actions." *Id.* at 953. The Ninth Circuit explained that California raised "a belated collateral attack" on the Secretary's decision to take land into trust, which could only be reviewed under "a petition for review pursuant to the APA." *Id.*

Perhaps tacitly recognizing that we can review the Secretary's authority to take lands into trust only under the APA, Alabama argues the district court should have permitted it to amend its complaint to add the Secretary as a party and assert an APA claim. Even assuming, *arguendo*, that Alabama properly sought leave from the district court to amend its complaint to add an APA claim against the

22

Secretary,[21] we cannot say that the district court abused its discretion when it denied Alabama the opportunity to amend its complaint because amendment would have been futile. *See Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263-64 (11th Cir. 2004) (no abuse of discretion in denying leave to amend when amendment would have been futile).

A six-year general statute of limitations applies to APA claims brought against the United States; the statute begins to run when the agency issues the final action that gives rise to the claim. *See* 28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."); *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1280 (11th Cir. 2007). Because the Secretary accepted the lands at issue into trust for the Tribe in 1984, 1992, and 1995, the statute of limitations to challenge those decisions had run by 1991, 1999, and 2002, respectively.

Alabama attempts to skirt the time bar by invoking an exception to the APA's statute of limitations for as-applied challenges. We have allowed an untimely challenge to a regulation on which an agency relies in taking final agency action on the ground that the regulation was outside the agency's statutory authority. *See Legal Envtl. Assistance Found., Inc. v. EPA*, 118 F.3d 1467, 1472-

---

[21] Alabama never filed a motion to amend its complaint to add the Secretary as a party or to add an APA claim in the district court, but it did request such leave in its response to the United States's *amicus* brief in the district court.

23

73 (11th Cir. 1997) (citing *NLRB Union v. Fed. Labor Relations Auth.*, 834 F.2d 191, 194-97 (D.C. Cir. 1987)).  But we are unpersuaded that the exception applies in this case.

The exception gives a party ultimately affected by a rule "an opportunity to question [the rule's] validity" when the party could not have brought a timely challenge.  *NLRB Union*, 834 F.2d at 196 (internal quotation marks omitted).  Alabama does not argue it was unaware that the Secretary was taking land into trust for the Tribe; indeed, record evidence confirms that Alabama was given notice when the Secretary took the lands into trust.  Because Alabama could have brought a timely APA challenge, we will not carve out an exception to the six-year statute of limitations.  *See Big Lagoon Rancheria*, 789 F.3d at 954 n.6 (rejecting, based on evidence showing that California had previously acknowledged that the Secretary had taken the land at issue into trust, the argument that the state should be permitted to raise an untimely challenge to the Secretary's land-into-trust decision).

We are in no position, given the procedural posture of this case, to disturb the Secretary's long-ago decisions to take the lands in question into trust— decisions which Alabama could have but chose not to challenge at the time.  As the district court found, the deeds to the lands on which the casinos sit demonstrate the United States holds title in trust for the benefit of the Tribe.  Because the lands at

24

issue are properly considered "Indian lands," the Individual Defendants are immune from Alabama's state law claim.[22]

### b.  Waiver of Immunity

Alabama argues in the alternative that the Individual Defendants waived their immunity from the state law claim by removing the case to federal court. Alabama's argument rests on the assumption that the Individual Defendants enjoy immunity from the state law claim in federal court but not in state court.  The sole case on which Alabama relies addresses *state* officials' immunity from state law claims in state court, not *tribal* officials' immunity from state law claims in state court.  *See Ala. Dep't of Transp. v. Harbert Int'l, Inc.*, 990 So. 2d 831, 840 (Ala. 2008), *abrogated in part by Ex parte Moulton*, 116 So. 3d 1119 (Ala. 2013).  State law cannot limit the Individual Defendants' immunity because "tribal immunity is a matter of federal law and is not subject to diminution by the States." *Bay Mills*, 134 S. Ct. at 2031 (internal quotation marks omitted); *see also Contour Spa at the Hard Rock, Inc. v. Seminole Tribe of Fla.*, 692 F.3d 1200, 1206 (11th Cir. 2012) (explaining that a tribe's sovereign immunity "is not the same thing as a state's Eleventh Amendment immunity" because tribes are more akin to foreign sovereigns).  Because the premise of Alabama's argument—that the Individual

---

[22] Because the Individual Defendants enjoy immunity from Alabama's state law claim, we need not reach whether the state law claim is preempted.  In any event, Alabama concedes that its state law claim is preempted if the casinos are located on Indian lands.

25

Defendants were not immune from the state law claim in state court—does not hold up, Alabama's waiver argument fails.

In summary, PCI is entitled to tribal sovereign immunity as to all of Alabama's claims; thus, the district court properly dismissed all claims against PCI. The Individual Defendants are entitled to tribal sovereign immunity on Alabama's state law claim but not its federal law claim under IGRA.

## V.    RIGHT OF ACTION UNDER § 1166

Because tribal sovereign immunity does not bar Alabama from bringing a federal claim against Individual Defendants under IGRA to enjoin alleged illegal class III gaming activities at the casinos, we now consider the Individual Defendants' argument that Alabama failed to state a claim for relief on the ground that 18 U.S.C. § 1166 provides Alabama with no right of action. Alabama argues that § 1166 gives states a right of action to bring federal claims against tribal officials who violate state gambling laws.

The Supreme Court has suggested in *dicta* that a state cannot sue under § 1166: "[I]f a tribe opens a casino on Indian lands before negotiating a compact, the surrounding State cannot sue; only the Federal Government can enforce the law." *Bay Mills*, 134 S. Ct. at 2034 n.6 (citing 18 U.S.C. § 1166(d)). Similarly, in *dicta* in *Seminole Tribe II*, we expressed "some doubt about whether [§ 1166] would permit a state to bring an action in federal court seeking state-law injunctive

relief against a tribe for violating state gambling laws." 181 F.3d at 1246 n.13. With this question of first impression now squarely before us, we hold that § 1166 does not provide states with either an express or implied right of action to sue tribal officials to enjoin unlawful gaming on Indian lands.

It is well established that the mere "fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979). A statute may, but does not necessarily, create a cause of action either expressly or by implication. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979). "The question of the existence of a statutory cause of action is, of course, one of statutory construction." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979).

## A.    Express Right of Action

We begin with the question whether § 1166(a) provides a state with an express cause of action to sue tribal officials. To determine whether a statute provides an express right of action, we look for an "express provision granting [] a federal cause of action to enforce the provisions of that act." *Smith v. Russellville Prod. Credit Ass'n*, 777 F.2d 1544, 1547 (11th Cir. 1985).

Under § 1166(a), with respect to class III gaming conducted without a tribal-state compact, "all State laws pertaining to the licensing, regulation, or prohibition

27

of gambling . . . shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State."  18 U.S.C. § 1166(a).  Although § 1166(a) contemplates that for purposes of federal law, state laws pertaining to class III gaming shall apply in Indian country as they do in the rest of the state, § 1166 lacks any language explicitly creating a federal cause of action for a state to sue to enforce its laws.[23]  Accordingly, we hold that § 1166 does not create an express right of action.

## B.    Implied Right of Action

We turn now to the more difficult question, whether § 1166 creates an implied right of action for a state to sue tribal officials to enjoin violations of state gaming laws occurring on Indian lands.  After considering our law governing implied rights of action, which requires clear evidence of congressional intent; our prior decision in *Seminole II*; and the statutory text, structure, and legislative history of IGRA, we hold that § 1166 does not create an implied right of action for states to sue tribal officials to enforce state gambling laws.

---

[23] For examples of language Congress has used in expressly creating a right of action, see 15 U.S.C. § 15(a) ("[A]ny person who shall be injured . . . by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . ."); 18 U.S.C. § 2520(a) ("[A]ny person whose wire, oral, or electronic communication is intercepted . . . may in a civil action recover . . . ."); 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought. . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan . . . ."); 42 U.S.C. § 1983 ("Every person who, under color of any statute . . . subjects . . any citizen of the United States . . . to the deprivation of any rights . . . shall be liable to the party injured in an action at law . . . .").

28

### 1.    Congressional Intent

In determining whether a statute gives rise to an implied right of action, "'[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.'" *Love v. Delta Air Lines*, 310 F.3d 1347, 1352 (11th Cir. 2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)).  In the absence of congressional intent to create an implied right of action, "'a cause of action does not exist[,] and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.'"  *Id.* (quoting *Sandoval*, 532 U.S. at 286-87).  "There must be clear evidence of Congress's intent to create a cause of action."  *McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 723 (11th Cir. 2002) (internal quotation marks omitted).

To determine whether Congress intended to create an implied right of action, "[f]irst and foremost, we look to the statutory text for 'rights-creating' language." *Love*, 310 F.3d at 1352 (quoting *Sandoval*, 532 U.S. at 288); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1387 (2015) (explaining that there was no implied right of action when a statute "lack[ed] the sort of rights-creating language needed to imply a private right of action").  Rights-creating language "explicitly confer[s] a right directly on a class of persons that include[s] the plaintiff in the case."  *Cannon*, 441 U.S. at 690 n.13.  Rights-creating language

29

does "more than create a generalized duty for the public benefit, states more than declarative language, and focuses more than just 'on the person regulated.'" *Shotz v. City of Plantation*, 344 F.3d 1161, 1167 (11th Cir. 2003) (quoting *Sandoval*, 532 U.S. at 289).

"Second, we examine the statutory structure within which the provision in question is embedded." *Love*, 310 F.3d at 1353. In considering the statutory scheme, we keep in mind the "cardinal principle" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). Additionally, we have explained that when the "statutory structure provides a discernible enforcement mechanism . . . we ought not imply a private right of action." *Love*, 310 F.3d at 1353. In other words, "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290*; see also Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1217 (11th Cir. 2015) ("Where Congress knows how to say something but chooses not to, its silence is controlling." (internal quotation marks omitted)).

Third, we look to "legislative history and context within which a statute was passed." *Love*, 310 F.3d at 1353. We consider legislative history "if—and only if—statutory text and structure have not conclusively resolved whether a [] right of

30

action should be implied." *Id.* Moreover, we view legislative history suggesting the existence of an implied right of action "with a skeptical eye." *Id.*

### 2.    Our *Seminole Tribe II* Decision

In *Seminole Tribe II*, we held that the provision of IGRA requiring a tribal-state compact for a tribe to engage in class III gaming, 25 U.S.C. § 2710(d)(1)(C), created no implied right of action for a state to sue a tribal official to enjoin class III gaming occurring without a compact.[24] 181 F.3d at 1246. We explained that neither the statutory scheme of IGRA nor IGRA's legislative history provides evidence that Congress intended to create such an implied right of action. *Id.* at 1247-49. While Florida argued in *Seminole Tribe II* that through § 1166 the tribe had committed "federal crimes by violating [Florida's] state-law ban on slot machines, which applies to the Tribe's lands for purposes of federal law," the state did "not contend that [§ 1166] implicitly provide[d] it with a right of action." *Id.* at 1240, 1247. In other words, the question whether § 1166 created an implied right of action was not before us in *Seminole Tribe II*.

---

[24] We framed the issue as whether a state had a "private right of action" to sue a tribal official. *Seminole Tribe II*, 181 F.3d at 1250. Because a state is a public rather than a private actor, we acknowledge that the label of a "private" right of action may not be wholly accurate. Here, however, no party has argued that we should use a different framework to analyze when a state, as opposed to a private party, has an implied right of action. In any event, we note that we have in the past employed the same analysis when deciding whether a state or a private party has an implied right of action. *Compare id.* at 1246-47 (considering whether a state has an implied right of action) and *Fla. Dep't. of Bus. Regulation v. Zachy's Wine & Liquor, Inc.*, 125 F.3d 1399, 1402-03 (11th Cir. 1997) (same) *with McDonald*, 291 F.3d at 726 (considering whether an individual has an implied right of action).

31

Although we did not address in *Seminole Tribe II* whether § 1166 gives rise to an implied right of action, our discussion of IGRA's statutory scheme and legislative history nevertheless applies to our analysis of the issue in this case. We explained in *Seminole Tribe II* that because Congress provided a "multitude of express remedies" in IGRA, we would not read into IGRA an additional implied right of action. *Id.* at 1248-49. We also described how IGRA's legislative history showed that Congress carefully balanced federal, state, and tribal interests, ultimately limiting the application of state laws on tribal lands. *Id.* at 1247 (citing S. Rep. No. 100-446, at 5-6 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3074-76). Recognizing an implied right of action under IGRA, we said, would "upset the carefully-struck congressional balance of federal, state, and tribal interests and objectives." *Id.* at 1248. With these principles in mind, we consider whether Congress intended to create an implied right of action in § 1166.

### 3.    Analysis of 18 U.S.C. § 1166(a)

In § 1166(a), Congress did not intend to create an implied right of action that would give states the right to sue to enjoin class III gambling even if such gambling was a nuisance that could be enjoined under state law. We reach this conclusion after considering the text of § 1166 and the structure and legislative history of IGRA. *See Love*, 310 F.3d at 1352-53.

32

a.    Rights-Creating Language

We begin by looking to the text of § 1166(a) for rights-creating language.

Section 1166(a) states:

> Subject to subsection (c), for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.[25]

The plain language of § 1166(a) has the effect of incorporating state laws pertaining to the licensing, regulation, or prohibition of gambling into federal law such that those state laws extend into Indian country, where they did not previously reach. Congress clearly expressed that the laws that were incorporated included, but were not limited to, state criminal laws. Although § 1166(a) extends the reach of state law, it does not correspondingly extend a state's power to enforce state law in Indian country because § 1166 does not contain rights-creating language.

The Supreme Court has held that statutes decreeing that "[n]o person . . . shall . . . be subjected to discrimination, " *Cannon*, 441 U.S. at 681, 690 (citing 42 U.S.C. § 2000d), and that "no person shall be denied the right to vote," *Allen v. State Bd. of Elections*, 393 U.S. 544, 555-57 (1969) (citing 42 U.S.C. § 1973c, (current version at 52 U.S.C. § 10304(a))), contained rights-creating language. *See also Shotz*, 344 F.3d at 1167 (concluding that a statute stating that "[n]o person

---

[25] Subsection (c) specifies that § 1166 applies only to class III gaming conducted outside a tribal-state compact.

shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter" contained rights-creating language (citing 42 U.S.C. § 12203(a)).  In contrast, a statute that merely describes how the *federal government* will effectuate or enforce rights does not contain rights-creating language.  *See Sandoval*, 532 U.S. at 288-89 (holding that a statute, which did not focus on "the individuals who will ultimately benefit from [its] protection" and instead described how rights created in other provisions will be effectuated, did not contain rights-creating language).

Section 1166(a) contains no language conferring rights on states or any other potential plaintiff who would have a claim under state law.  Unlike statutes that contain rights-creating language, § 1166 does not identify a class of persons or entities protected under the statute.  Although § 1166(a) states that "all State laws . . . shall apply in Indian country in the same manner . . . as such laws apply elsewhere in the State," this language does not indicate that Congress intended the states to be beneficiaries under the statute.  The plain language shows that the focus of § 1166(a) is on "State laws," not the states themselves.  Where, as here, the focus of a statute is "removed from the individuals who will ultimately benefit from [its] protection," the statute does not contain rights-creating language.  *See Sandoval*, 532 U.S at 289.

b.    Statutory Structure

The statutory structure of § 1166 supports our conclusion that the text of § 1166(a) does not reflect congressional intent to create an implied right of action. To the contrary, the structure of § 1166 undercuts Alabama's argument that subsection (a) incorporates all remedies available under state law into federal law. The structure of IGRA as a whole also belies congressional intent to create an implied right of action under § 1166(a) for states to sue to enjoin unlawful gaming because IGRA expressly prescribes other remedies applicable when a tribe conducts class III gaming without a tribal-state compact.

(i)    Section 1166

As discussed above, § 1166(a) provides that in the absence of a tribal-state compact, all state laws (whether criminal, civil, or regulatory) pertaining to gambling are incorporated into federal law so that state laws prohibiting class III gaming apply on Indian lands. But § 1166(a) does not address how these state laws are to be enforced. Read in its entirety, § 1166 supports our conclusion that Congress did not intend silently to create an implied right of action for states to sue to enjoin gambling occuring on Indian lands in violation of state law.

The remainder of § 1166 focuses on how state criminal laws pertaining to gaming apply in Indian country. Subsection (b) states:

> Whoever in Indian country is guilty of any act or omission involving gambling . . . which . . . would be punishable if committed . . . within the jurisdiction of the State . . . under the laws governing the licensing, regulation, or prohibition of gambling . . . shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 1166(b).[26]  Under this subsection, if a person commits in Indian country an act involving gaming that would be a crime under state law, his actions constitute a federal crime.  Furthermore, the punishment for this federal crime is the same as the punishment would be for the same crime under state law.[27]

Subsection (d)[28] then clarifies that the United States has "exclusive jurisdiction" over these criminal prosecutions.  *Id.* § 1166(d).

Alabama reasons that because it may sue to enjoin illegal gambling as a nuisance under state law, it has a similar right of action under § 1166(a).  Underlying Alabama's argument is the assumption that § 1166(a) incorporated the entirety of a state's law pertaining to the licensing, regulation, or prohibition of

---

[26] Subsection (b) is directly modeled on the Federal Assimilative Crimes Act, which states that for federal enclaves, such as military bases, "[w]hoever . . . is guilty of any act or omission which . . . would be punishable if committed or omitted within the jurisdiction of the State . . . in which such place is situated . . . shall be guilty of a like offense and subject to a like punishment."  18 U.S.C. § 13(a).  The Supreme Court has explained that the effect of § 13 is to create in federal enclaves complete "conformity with the criminal laws of the respective States in which the enclaves are situated."  *United States v. Sharpnack*, 355 U.S. 286, 293 (1958).

[27] The Individual Defendants argue that under § 1166(b) the violation of any state gaming laws (civil, criminal, or regulatory) constitutes a federal crime.  We disagree.  Subsection (b) by its plain language makes conduct a federal crime only when an individual is "guilty" of an act which "would be punishable" under state law.  This language limits the scope of subsection (b) to state criminal laws.  *See Crime*, Black's Law Dictionary (10th ed. 2014) (defining a "crime" as "[a]n act that the law makes punishable").

[28] As noted above, subsection (c) specifies that § 1166 applies only to class III gaming conducted in the absence of a tribal-state compact.  18 U.S.C. § 1166(c).

36

gambling into federal law, including all civil remedies and criminal punishments. Alabama's interpretation cannot be correct because it would render subsection (b), which states specifically that state criminal punishments are incorporated into federal law, superfluous. *See TRW Inc.*, 534 U.S. at 31 (rejecting construction that would render a provision of a statute superfluous). In other words, the fact that in § 1166(b) Congress expressly incorporated the punishments from state *criminal* laws into federal law is evidence that Congress did not intend § 1166(a) to incorporate into federal law the entirety of a state's substantive laws and remedies regarding gambling.

Alabama also argues that because subsection (d) specifies only that the United States has exclusive jurisdiction over criminal prosecutions, we should infer that the United States and the states share jurisdiction to enforce state civil laws regarding gaming.[29] Alabama's argument again rests on the flawed assumption that § 1166 incorporates into federal law all state law remedies. As discussed

---

[29] In its briefing Alabama argues that the United States has an implied right of action to sue to enforce state gaming laws. Appellant's Br. at 36-37, 43 (citing *United States v. Santee Sioux Tribe of Neb.*, 135 F.3d 558, 562-65 (8th Cir. 1998); *United States v. Seminole Tribe of Fla.*, 45 F. Supp. 2d 1330, 1331 (M.D. Fla. 1999)). But, at the same time, Alabama also argues that "*states* have exclusive authority to bring civil actions under Section 1166(a)." *Id.* at 41 (citing *United States v. Santa Ynez Band of Chumash Mission Indians of Santa Ynez Reservation*, 983 F. Supp. 1317, 1319 (C.D. Cal. 1997)). Alabama makes no attempt to reconcile its argument that states have exclusive authority to bring civil actions with its argument that subsection (d) implies that the federal government and states share the right to bring civil actions.

To be clear, the issue of whether the United States has a civil right of action under § 1166 is not before us, and we express no opinion on it.

37

above, although § 1166(b) explicitly provides that a person violating a state criminal law pertaining to gambling on Indian land shall be punished under federal law as she would be under state law, there is no provision explicitly creating a federal remedy for violation of a state civil law. *See* 18 U.S.C. § 1166.[30]  Because of this omission, which we must presume to have been intentional, we cannot conclude from the fact that the United States has exclusive authority to bring criminal prosecutions that the United States and the states both may enforce state civil laws. *See Animal Legal Def. Fund*, 789 F.3d at 1217.

### (ii)    IGRA

The statutory scheme of IGRA as a whole provides additional evidence that Congress did not intend in § 1166 to create an implied right of action for states. As an initial matter, we must bear in mind Congress's stated intent that under IGRA the federal government would be the principal authority regulating Indian gaming. *See* 25 U.S.C. § 2702(3) (expressing congressional intent for IGRA to establish "independent Federal regulatory authority . . . [and] Federal standards" to govern gaming on Indian lands).

---

[30] Alabama argues that it is possible for Congress to create a right of action for an individual to sue under a criminal statute, citing a string of statutes that create an express private right of action for violation of federal criminal laws. But because these statutes expressly grant rights of action, they are irrelevant to whether Congress clearly intended to create an implied right of action under § 1166.

In IGRA, Congress created express remedies for states when a tribe engages in class III gaming in the absence of a tribal-state compact or conducts class III gaming that violates the terms of a compact. First, Congress authorized the NIGC to levy fines or close a gaming facility if a tribe engages in class III gaming without a tribal-state compact.[31] *See Seminole Tribe II*, 181 F.3d at 1248 (citing 25 U.S.C. § 2713). Second, a state may sue in federal court when a tribe violates the terms of a tribal-state compact by conducting class III gaming that is not permitted by the compact. *See* 25 U.S.C. § 2710(d)(7)(A)(ii).

Because IGRA expressly provides these remedies, we "should not expand the coverage of the statute to subsume other remedies." *Seminole Tribe II*, 181 F.3d at 1248 (internal quotation marks omitted).[32] Put differently, the fact that Congress provided these enforcement mechanisms shows that it "intended to preclude" other enforcement mechanisms—like an implied right of action—to prevent tribes from engaging in class III gaming without a compact. *Sandoval*, 532

---

[31] The NIGC has, in fact, exercised this power, ordering tribes to cease and desist from operating class III gaming without a tribal-state compact. *See, e.g.*, *Coyote Valley Band of Pomo Indians*, CO-04-01 (Nat'l Indian Gaming Comm'n June 10, 2004), http://www.nigc.gov/Reading_Room/Enforcement_Actions/CO-04-01.aspx; *Seminole Nation of Okla.*, NOV-CO-00-06 (Nat'l Indian Gaming Comm'n May 30, 2000). http://www.nigc.gov/LinkClick.aspx?link=NIGC+Uploads/readingroom/enforcementactions/seminolenationok/NOVCO0006.pdf. Copies of the Internet materials cited in this opinion are on file in the Clerk's Office. *See* 11th Cir. R. 36, I.O.P. 10.

[32] Alabama claims that if states cannot sue, tribes will simply engage in class III gaming without compacts. But, it is mere speculation that the prospect of federal enforcement will not ensure tribes' compliance with IGRA.

U.S. at 290; *see Seminole Tribe II*, 181 F.3d at 1248-49 (describing availability of these other remedies as a "clear signal" that Congress did not intend to create an implied right of action for states to sue).

Indeed, if we were to hold that states could sue to enjoin class III gaming when a tribe engaged in class III gaming without a compact, we would undermine IGRA's careful balance of federal, state, and tribal interests. *Seminole Tribe II*, 181 F.3d at 1247. Section 2710(d)(7)(A)(ii) indicates that Congress intended for a state to have a right of action to enjoin class III gaming only where the gaming is unauthorized by a compact between the state and the tribe allowing some class III gaming. Permitting a state to sue to enjoin class III gaming in the absence of a compact "would be tantamount to deleting the second requirement that must be met in order for the state to pursue this express right of action" under § 2710(d)(7)(A)(ii). *Seminole Tribe II*, 181 F.3d at 1249. We cannot "usurp the legislative role by deleting it ourselves, particularly when doing so would undermine one of the few remaining incentives for a state to negotiate a compact with a tribe." *Id.*

Alabama argues that because Congress permitted a tribe to engage in class III gaming only if its lands were "within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity," it must have intended to provide the state with a remedy to enforce its laws prohibiting such

40

gaming.  25 U.S.C. § 2701(5).  But, again, the fact that Congress may have intended for a state to be free from Indian gaming within its borders where such gaming was completely prohibited under the state's law does not mean that 18 U.S.C. § 1166 creates a remedy for the state to enforce this right.  *See Cannon*, 441 U.S. at 688 ("[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person.").

### c.    Legislative History

After considering the text of § 1166 and the structure of IGRA, we conclude that Congress did not intend to create an implied right of action in § 1166.  But even if the statutory text and structure did not conclusively resolve whether there is an implied right of action, the legislative history and context of the statute make Congress's intent clear.  As we explained in *Seminole Tribe II*, the legislative history "indicates that Congress, in developing a comprehensive approach to the controversial subject of regulating tribal gaming, struck a careful balance among federal, state, and tribal interests."  181 F.3d at 1247 (citing S. Rep. No. 100-446 at 5-6).  To strike this balance, Congress placed "limits on the application of state laws and the extension of state jurisdiction to tribal lands."  *Id.* (citing S. Rep. No. 100-446 at 5-6).  According to the Senate Report, "'the compact process is a viable mechanism for setting various matters between [states and tribes as] equal

sovereigns.'" *Id.* at 1248 (quoting S. Rep. No. 100-446 at 13) (alteration in original). The Senate Report recognized the need for "'some incentive'" for states to negotiate in good faith. *Id.* (quoting S. Rep. No. 100-446 at 13). Permitting states to sue to enjoin class III gaming without a compact "would surely frustrate [Congress's] intent [as expressed in the legislative history]." *Id.*

Thus, like the district court below, we fail to discern a private right of action that would allow Alabama to bring a federal claim under IGRA to enjoin the Tribes' alleged class III gaming.

## VI.    CONCLUSION

We conclude that (1) PCI is entitled to sovereign immunity as to all of Alabama's claims; (2) the Individual Defendants are entitled to sovereign immunity as to Alabama's state law claim; and (3) Alabama failed to state a claim under IGRA because 18 U.S.C. § 1166 gives states no right of action to sue. Accordingly, we affirm the judgment of the district court.

**AFFIRMED.**